[No. S004447, Crim. No. 22584. Aug. 11, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD BOYDE, Defendant and Appellant.

214

216

218

220

COUNSEL

John M. Bishop, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Jay M. Bloom, Frederick R. Millar and John W. Carney, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PANELLI, J.—Appellant Richard Boyde was convicted of robbery and kidnapping for robbery and found to have personally used a knife in perpetrating these offenses upon a gas station attendant in Riverside on January 5, 1981. (Pen. Code, §§ 211, 209, subd. (b), 12022, subd. (b).)[1] In addition, Boyde was convicted of robbery, kidnapping for robbery, and first degree murder of the clerk in a 7-Eleven store in Riverside on January 15, 1981. (§§ 211, 209, 189.) The jury found two special circumstances true (murder during the commission of robbery (§ 190.2, subd. (a)(17)(i)) and during the commission of kidnapping in violation of section 209 (§ 190.2, subd. (a)(17)(ii))), found that Boyde personally used a firearm in perpetrating all three offenses (§ 12022.5), and specially found that Boyde "personally killed [the victim] with express malice aforethought and premeditation and deliberation." The jury fixed the penalty at death; the appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## I. FACTS

### A. *The Gas Station Robbery.*

About 2 a.m. on January 5, 1981, the attendant at a Union 76 gas station in Riverside was robbed of $50 and his watch by a man who had entered the office and displayed two knives. Following the robber's directions, the attendant, Baker, opened the trunk of his car (which was full of miscellaneous items), closed the trunk, turned out the lights, closed up the station, and drove away with the robber in Baker's car. They drove to a park where they smoked a cigarette and talked. The robber said he was out of a job, having just returned from college in the east, and he needed the money to feed his two-month-old baby. He warned Baker not to run away and said he did not plan to use the knives but only had them for self-protection in case Baker tried to "be a hero." The robber then had Baker drive to a doughnut stand where he bought Baker a doughnut. They began walking down the street together after they could not get the car started. During this walk the robber indicated he expected to get caught and asked Baker to give a false description to police. Baker said he would not, and shortly thereafter the robber abruptly turned and ran away.

Baker gave a description to police and later selected Boyde's picture from a photo lineup. He also identified Boyde at trial.

### B. *The 7-Eleven Robbery-homicide.*

About 4 a.m. on January 15, 1981, Riverside police received a report that the 7-Eleven store on Indiana Street was deserted. Investigating officers found a bullet hole in the store window. With the help of the owner it was determined that $33 had been taken from one of the cash registers and that several hats and hatbands were missing.

Three and one-half hours after the initial report, a local citizen found a body in a nearby orange grove and reported his finding to police at the 7-Eleven store. Investigators found the body, later identified as the store's night clerk Dickie Gibson, lying on its back in the dirt. Detective Callow noticed a gunshot wound in the victim's forehead, a slight wound on the small finger of his right hand, and abrasions on his knees. There were five identifiable footprints at the scene, including an impression left by a flat-soled left shoe near the victim's head and several impressions with a diamond pattern located four feet from the body, near its feet. The autopsy showed the victim was killed by a bullet wound above the right ear, which was probably fired from a .22-caliber gun from a distance of more than 16 inches. There were also gunshot wounds to the fingers of the right hand.

The shot to the forehead had not penetrated the skull and was not the cause of death, but the nature of the wound indicated it had been inflicted from close range, probably six to twelve inches. The abrasions on the hands and on the knees could have been caused by a hard dirt or asphalt surface. Death probably occurred between 3 a.m. and 5 a.m. on January 15. The victim's brother testified that everything had appeared normal when he stopped by the store for a visit between 1 and 1:40 a.m.

## C. *Appellant's Arrest and Statements to Police.*

Detective Knoffloch, who was investigating the 7-Eleven homicide, showed Boyde's photo to Detective Callow, who was investigating the Baker robbery at the gas station as well as the homicide. After Baker selected Boyde's photo from a photo lineup, Callow obtained a warrant to search Boyde's home. The search recovered a distinctive watch which Baker identified as his. Boyde was placed under arrest on January 22 for the robbery and kidnapping of Baker.

At 8:15 that evening, Callow found Boyde yelling and creating a disturbance in the holding cell. Callow described Boyde as "very, very hyper"; his arms were clutched across his chest and he was physically shaking. Boyde told Callow he could not stand being locked up. Callow took him to an interview room and gave him cigarettes and coffee.

After advisement as required by *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], Boyde waived his rights and agreed to discuss the gas station robbery with Detective Callow. Callow informed Boyde he was under arrest for this robbery and that the watch recovered from Boyde's home had been stolen in it. Boyde denied involvement and claimed he had bought the watch from "Moe." Confronted with information that clothing recovered from his home matched the description of the robber's clothes, Boyde claimed he had loaned the clothes to "Moe." Told that the victim had selected his picture in a photographic lineup, Boyde explained that "Moe" looked quite a bit like him. Finally, confronted with Callow's assertion that police had sufficient evidence to prove he committed the robbery, Boyde said, "you got me."

Boyde then became disturbed at the prospect of returning to prison or jail and asked if there were any way he could avoid it. Callow told him "six or seven times" the police department could not make any such promises. Boyde then asked what would happen if he had information—specifically about the football coach at the 7-Eleven store who was killed. Callow said that he would be willing to relay his information to the district attorney's office.

Boyde then told Callow that he had been at his nephew Carl Franklin's[2] house between 2:30 and 3 a.m. when his nephew and Big Mike drove up in Big Mike's car. Big Mike got out, holding a paper bag with money in it and a gun. Eventually, Ellison told Boyde the two men had held up the 7-Eleven store on Indiana Street and had taken the clerk to an orange grove and shot him in the head. Boyde identified Big Mike's gun as a .22-caliber revolver.

Unable to find any Department of Motor Vehicles or police department record of "Carl Franklin" or "Big Mike," Callow asked Boyde if he would be willing to show officers Carl Franklin's house. Boyde agreed and directed the officers to Ellison's house. Boyde was not able to find Big Mike's house.

At 8:30 the next morning Detectives Ropac and Lund, also unable to find any information on "Big Mike" or "Carl Franklin," confronted Boyde with their belief that he had been untruthful with Detective Callow. Boyde agreed to talk further, and a second *Mirandized* interrogation was conducted and tape-recorded. This time Boyde admitted he had been with Ellison from 11 p.m. on January 14 through the time of the homicide. Boyde explained that Ellison had come to Boyde's apartment complex to borrow some gas money from his grandmother. Ellison invited Boyde to go riding with him in his mother's car. The two rode to Ellison's house in Hillside where they drank some beers with guys from the neighborhood, including Big Mike. The group broke up about 11:45, and Big Mike invited Boyde to go riding with him and Ellison. Boyde accepted but asked to be home early. The three drove to San Bernardino, around Riverside and then returned to Ellison's house. There Ellison pulled out a loaded .22-caliber hand gun that belonged to Ellison's mother, Otharean Owens.

The three men drove to the 7-Eleven store at Indiana and Monroe Streets so that Boyde could buy cigarettes and a soda. Both Boyde and Big Mike got out of the car, but Big Mike went into the store alone while Boyde and Ellison waited outside. It was late. The clerk unlocked the door to let Big Mike in, and Big Mike walked to the back of the store. As Boyde was returning to the car, he looked up in time to see Big Mike pull the gun on the clerk who raised his hands and then put money from the cash register into a bag. Big Mike then brought the clerk outside and told him to get in the back seat of the car. The clerk did not close the car door completely, and as Big Mike entered the other rear door, the clerk threw a stereo speaker at him and ran from the car. Big Mike fired once and then chased him. The clerk fell near the side of the store, and Big Mike caught up with him. They returned to the car, and Big Mike told Ellison to drive up

[2] The codefendant, Boyde's nephew, is named Carl Franklin Ellison. For the sake of clarity we will refer to him as Ellison.

Monroe toward the orange groves. Boyde tried to convince Big Mike to let the clerk go, but he refused.

They stopped the car on the pavement near the groves. Big Mike and the clerk walked into the trees. The clerk did not try to escape but asked whether he would be shot. Big Mike said no. Ellison turned the car around. From 25 to 30 feet Boyde could see Big Mike force the clerk to get on his knees facing the trees and place his hands on top of his head. Big Mike stood behind. After Big Mike fired once, the clerk dropped his hands and turned partly around. Big Mike fired a second shot into the back of the clerk's head, and he fell face forward in the dirt. Big Mike rolled the clerk's body over and fired another shot into his head from about a foot away.

The detectives expressed their skepticism at Boyde's ability to describe the robbery in such detail if he had not been inside the store. Finally, Boyde broke down and admitted that he and Ellison had been in the store and there was no one named Big Mike involved. Boyde said he and Ellison had gone out that night for the purpose of committing a robbery because Ellison needed some money. Ellison had trouble selecting a target, and it was about 2:30 a.m. before he finally decided he wanted to rob the 7-Eleven store. They pulled into a nearby driveway, and Boyde took over the wheel. Both men entered the store, but Boyde had gone back outside before Ellison pulled the gun. They had never discussed kidnapping the clerk, but Ellison brought him out of the store and told him to get in the back seat of the car behind Boyde who was driving. When the clerk ran, it was Ellison who fired the gun and chased him. They drove to the orange grove where Ellison and the clerk got out. Boyde turned the car around and then got out and walked into the grove. Ellison forced the clerk to kneel with his hands on his head. The first shot missed; the clerk brought his hands down and looked at one of them. Then Ellison fired a shot into the back of the clerk's head. The clerk fell forward. Boyde asked if he was dead. Ellison did not know and said he thought he better make sure. Ellison put the gun in his pocket, grabbed the clerk's body by the legs and rolled him over so that the body was parallel to a ditch. The clerk was unconscious and making no audible sounds. Ellison shot him again in the head. Boyde drove them back to Ellison's house where Ellison stashed the used shells and the gun in the garage. Ellison took Boyde home.

Boyde described the kind of money taken in the robbery (a few ones, two fives and some change). He said he had worn tennis shoes but didn't remember where that particular pair was. He said Ellison was wearing canvas-topped, rubber-soled walking shoes.

D. *Ellison's Arrest and Statements.*

Based on Boyde's statement, the officers arrested Ellison and obtained warrants to search his house and car. Officers seized a .22-caliber revolver, two pairs of tennis shoes, and the car stereo speaker Boyde had described. The bullet fragments recovered from the victim could not be positively matched with the gun because of damage to the fragments. The tires of Ellison's mother's car were found to be consistent with tracks at the orange grove, but were not positively matched. One pair of size 13 tennis shoes was consistent with the diamond pattern footprints at the scene but could not be positively matched. The other tennis shoes were dissimilar to impressions at the scene. It was determined that Ellison wore a size 13D shoe and Boyde wore a size 9½C. The flat soled shoe prints near the victim's head were made by a shoe which was in the range of size 7 to size 9.

In an initial interview just after his arrest Ellison told police he had gone to bed at 10 p.m. on January 14 and said he knew nothing about the 7-Eleven robbery. In a second interview several hours later, after police had recovered the gun and some shoes from his house, Ellison continued to maintain his ignorance of the events. Officers then played portions of a tape in which Boyde stated that Ellison had shot the clerk. Ellison finally admitted he was there and said the shooting had happened "just like he [Boyde] said." Ellison then gave a statement which generally paralleled Boyde's description of the incident. It differed, however, in several important details. Ellison said the clerk tried to run away once coming out of the store, a second time from the car and a third time in the orange grove. Ellison placed the clerk alone in the back seat of the car, while Boyde had said Ellison rode in the back with the clerk. Ellison said he had fired two shots, not three, but did not know where the clerk had been wounded. It was dark, and Ellison closed his eyes when firing the first shot. Ellison said he discarded the spent cartridges in the orchard and that Boyde had hidden the gun in Ellison's mother's room. The interviewing officers expressed doubt about the truthfulness of the statement because Ellison did not know enough of the details, but Ellison stuck to it. He agreed to submit to a polygraph the following day.

Ellison stuck to his story during the initial portion of his interview with the polygraph operator, but later recanted. He claimed he did not kill the clerk, but that Boyde did. He said they had gone to the 7-Eleven to "take the money and leave," but Boyde had shot the clerk. Ellison then gave a detailed account of how the robbery came about. He claimed it was Boyde's idea, that Boyde had asked him to bring the gun and he had done so, that Boyde had driven around and selected the store and then had Ellison drive during the robbery, that Boyde had explained afterwards that he had to kill

the clerk because he was determined not to go back to prison. Ellison said he had gone into the grove to see what Boyde was doing and that he had turned the clerk over because Boyde told him to. Ellison was scared; he knew the man was dead. He said he had covered up for Boyde because he felt he bore half the responsibility because he had been present and because he knew Boyde would serve more time as a result of his prior conviction.

## II. Summary of Proceedings

Boyde, 24, and Ellison, 19, were jointly charged in the robbery, kidnapping and murder of Dickie Gibson, the night clerk at the 7-Eleven store. Only Boyde was alleged to have personally used a firearm in these crimes. (§ 12022.5.) Boyde was also charged with the robbery and kidnapping of Baker, the gas station attendant, and three prior convictions were alleged against him. One of the prior offenses was the robbery and kidnapping of the night clerk at the same 7-Eleven store on July 13, 1976.

The trial court heard extensive pretrial motions, including Boyde's motion to sever the counts alleged against him (§ 954), Boyde's motion to exclude evidence of his prior crimes (Evid. Code, § 1101), both defendants' motions to sever their trials (§ 1098), to suppress their incriminating statements to police (for asserted involuntariness and *Miranda* violations) and to exclude portions of those statements implicating the nondeclarant defendant in the Gibson robbery-murder. (*Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]; *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].)

Codefendant Ellison waived a jury trial several days before the hearing on the motion to sever trials. In light of that development, the court denied the motion to sever trials and granted defendants' motions to exclude each other's extrajudicial statements from their trials. The court also ruled that Boyde's jury could hear Ellison's anticipated defense testimony.

Following lengthy voir dire, the trial proceeded with the prosecution's case-in-chief against Boyde. The prosecutor presented testimony by Baker describing the nature and circumstances of the January 5, 1981, gas station robbery and Baker's in-court identification of Boyde as the perpetrator. The officers who investigated both 1981 crimes testified concerning fruits of the gas station robbery found in Boyde's home, the physical evidence at the 7-Eleven store, the physical evidence at the site where Gibson's body was found and the autopsy results. Boyde's three tape-recorded statements to investigating police officers were played for the jury. Otharean Owens—Ellison's mother and Boyde's sister—testified that during a conversation at the jail, Boyde admitted to her that Ellison was not involved in the killing.

On this state of the evidence the prosecution rested its case-in-chief. Both defendants moved for acquittal. (§§ 1118 and 1118.1.) The court denied both motions.

Boyde's defense consisted only of the testimony of Deputy District Attorney Robert Spitzer, which was offered in support of Boyde's claim that his incriminating statements were involuntary because they were elicited by a promise of lenience. (*People* v. *Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672].)

Ellison testified in his own defense before the jury. Unlike his prior statements to police, Ellison's trial testimony placed the blame for the 7-Eleven store robbery and killing entirely on Boyde. Ellison said he had given his mother's revolver to Boyde on the day before the 7-Eleven robbery, after Boyde asked where he could get a gun. Boyde asked Ellison to help commit a robbery, but Ellison hesitated. On the night of the 14th Ellison went to his grandmother's to borrow gas money. There he picked up Boyde. They drove to Boyde's girlfriend's house in San Bernardino, then returned to Riverside. Boyde asked Ellison to drive to a 7-Eleven store in La Sierra. When they got there Boyde told Ellison to rob the store. Ellison refused and pushed the gun away as Boyde tried to give it to him. As they drove back to Ellison's house, Boyde angrily called Ellison names. Ellison was frightened of Boyde. Some time later—around 2 a.m.—Boyde asked to be driven home and said he wanted to stop for cigarettes. At that time Ellison was aware of the gun lying on the front seat. Ellison, knowing the Indiana Street 7-Eleven would be open, drove there.

Boyde went into the store for cigarettes while Ellison stayed in the car. Ellison saw Boyde draw the gun and rob the clerk. Ellison got scared and started to back the car out of the parking space, but Boyde came to the door and told him to stop. Boyde brought the clerk outside, put him in the rear passenger side seat, and then walked to the driver's side rear door. As he was getting into the other rear seat, the clerk threw a loose speaker at Boyde and bolted from the car. Boyde fired a shot and chased him. Boyde brought the clerk back to the car at gunpoint. The clerk again got into the rear seat, and Boyde got into the front passenger seat.

Boyde told Ellison to drive. When they reached the orange groves, Boyde told Ellison to stop and turn off the lights. He ordered the clerk out of the car and told Ellison to turn the car around.

Ellison did as he was told, returned to the spot where he had left the others, and went into the grove to find Boyde. He heard a shot. When he found Boyde and the clerk, the clerk was lying on the ground breathing

loudly. Boyde told him to turn the clerk over, but Ellison refused and ran for the car. The car stalled; before Ellison could get it started he heard another shot. Boyde got in, saying, "let's get out of here."

Ellison asked why Boyde had shot the clerk, and Boyde said he would not go back to prison. Boyde told Ellison he had better not talk, that he was just as much at fault, and reminded him that the gun belonged to his mother. Ellison took Boyde home, left the gun with him, and then went home himself.

Ellison stated he did not know Boyde was going to rob the 7-Eleven on Indiana Street, did not know Boyde would kidnap the clerk, did not shoot the gun, and did not touch the clerk's body. As to his feelings about the clerk's death, Ellison testified, "if I could give my life to bring him back, I would do it."

Questioned about his earlier inconsistent statements to police, Ellison testified that he tried to take the blame for Boyde because he was scared of the consequences of his own involvement and because he did not want to see his uncle go back to prison.

On cross-examination Boyde's counsel emphasized Ellison's admission that he had given the gun to Boyde, Ellison's initial willingness to help with a robbery, and Ellison's motive for committing a robbery: Even though Ellison worked steadily for the City of Riverside, he had little or no money left after helping his mother out with the family expenses. Counsel challenged Ellison's claim that he acted out of fear of Boyde and pointed out that Ellison drove the car and selected a store he knew was open at 2 a.m. Counsel questioned Ellison extensively regarding his actions in the orange grove and compared Ellison's account to the photographic evidence showing footprints consistent with Ellison's very near the clerk's feet.

Boyde's counsel and the prosecutor jointly moved to introduce the transcripts and tape recordings of Ellison's extrajudicial statements as prior inconsistent statements (Evid. Code, § 1235), and the tapes were played for the jury.

Ellison's only other defense witness was Lucinda Taylor, his half-sister. Taylor testified that Boyde had come by Ellison's house on January 15 and that he seemed nervous. The two had sat in Ellison's mother's bedroom watching television for a while. Boyde sent her out of the room on contrived errands at least three times.[3]

---

[3] The gun was found by police under Otharean Owens's mattress.

In rebuttal of Ellison's evidence, Boyde called his wife Cynthia Boyde, who contradicted Otharean Owens's testimony about Boyde's alleged visiting-room admission of Ellison's innocence. Boyde also called his sister, Helen Kendricks, who corroborated Cynthia Boyde's testimony, and Preston Scott, who testified that Boyde was with him in Whittier for the whole day of January 15 and that he was not at Ellison's house that day.

Finally, Boyde testified in his own defense on rebuttal. Boyde placed primary blame for the robbery and complete responsibility for the killing on Ellison. Boyde testified that Ellison had talked with him about Ellison's frustration with his financial obligation to his mother and his need for more money to meet his personal expenses. Ellison proposed stealing the money he needed, but Boyde warned him of the dangers of doing so, including the possibility that he would be caught and sent to state prison. Nevertheless, on January 14 Ellison made up his mind to commit a robbery, and Boyde agreed to assist him.

Ellison obtained the gun from his mother's room. They met at Ellison's grandmother's and then drove to San Bernardino, back to Riverside and finally to La Sierra where Ellison knew of a possible target store. Once there Ellison realized he might be recognized because he often worked nearby and decided not to go through with the robbery. It was now about 2 a.m. and Boyde asked to be taken home. But Ellison wanted to visit a friend who lived in the apartments near the Indiana Street 7-Eleven. Boyde agreed since he wanted to buy cigarettes. After Ellison finished visiting his friend, he asked Boyde to drive. Boyde drove to the 7-Eleven and waited while Ellison went in for the cigarettes and a soft drink. Boyde started to follow Ellison into the store, but Ellison was already coming out with the clerk in front of him. He tried to put the clerk in the back seat, but the clerk ran. Ellison caught him and managed to get him into the car. He told Boyde to drive to the orange grove where he and the clerk got out and Ellison told Boyde to turn the car around. As he was turning the car, Boyde heard a shot from the grove. He returned to tell Ellison that he had seen another car up the road. When he found Ellison and the clerk in the orange grove, the clerk was lying face down in the dirt. Boyde had by then heard three shots in all. Ellison rolled the clerk over and, to make sure he was dead, fired the final shot into the clerk's forehead. Boyde watched from 10 feet away.

As they drove off, Ellison threw the spent shells out the car window. Ellison didn't want to talk about what had happened. Boyde testified that he had not expected a killing to happen, that he did not intend anyone be killed and that he did not himself shoot the clerk.

Boyde spent the following day with Preston Scott in Whittier; he was not at Ellison's house. He denied ever telling Otharean Owens that Ellison was not involved in the killing.

In spite of photographic evidence showing that the three sets of footprints in the orange grove which related to the crime were made by the clerk, tennis shoes similar in size and diamond tread pattern to Ellison's, and a pair of flat-soled shoes consistent with Boyde's shoe size, Boyde testified that he had worn tennis shoes with a circular sole pattern on the night of the homicide. He explained that he could not have worn his dress shoes that night because his brother-in-law had borrowed them prior to January 14. But his own witness, Helen Kendricks, testified that her husband borrowed the suit and shoes *after* Boyde was arrested and that they had never been returned because something happened to them.

The prosecutor went through the details of the three versions of the crime given in Boyde's prior statements. On the stand Boyde admitted he could not see the shooting from the car (as he said in his second version) and claimed, for the first time, that he knew the details of the first two shots only because Ellison had told him exactly what happened. On the stand Boyde said he had lied when he told Detectives Ropac and Lund that he saw Ellison make the victim kneel and fire the first two shots. When questioned about the location of the various footprints—particularly the smaller sized, flat-soled prints near the victim's head—Boyde responded only that neither he nor Ellison had worn such shoes.

The jury found Boyde guilty of all charged offenses and returned a special verdict that Boyde personally committed the homicide with malice, premeditation and deliberation.

The court found Ellison guilty of all counts charged. At sentencing, however, the court found Ellison's lesser culpability as an aider and abettor warranted striking the special circumstances. (*People* v. *Williams* (1981) 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029].) Ellison was sentenced to the term prescribed for first degree murder, 25 years to life.

### III. Claims of Guilt Phase Error

A. *Motion to Sever.*

Boyde contends that the trial court's refusal to order separate trials for the defendants constituted a prejudicial abuse of discretion. The California Penal Code provides for joint trials of defendants jointly charged with criminal offenses. "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court orders separate trials. . . ." (§ 1098.) The Legislature has in this manner expressed a preference for joint trials. (See *People* v. *Lara* (1967) 67 Cal.2d 365, 394 [62 Cal.Rptr. 586, 432 P.2d 202];

*People* v. *Isenor* (1971) 17 Cal.App.3d 324, 330-331 [94 Cal.Rptr. 746].) The statute nevertheless permits the trial court to order separate trials, and the decision to do so is one "largely within the discretion of the trial court." (*People* v. *Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669]; *People* v. *Graham* (1969) 71 Cal.2d 303, 330 [78 Cal.Rptr. 217, 455 P.2d 153].) Whether denial of a motion to sever constitutes an abuse of discretion must be decided on the facts as they appear at the time of the hearing on the motion to sever. (*People* v. *Turner, supra,* 37 Cal.3d at p. 312.)

■ The grounds which may justify a severance were summarized in *People* v. *Massie* (1967) 66 Cal.2d 899 [59 Cal.Rptr. 733, 428 P.2d 869]: (1) Where there is an extrajudicial statement made by one defendant which incriminates another defendant and which cannot adequately be edited to excise the portions incriminating the latter; (2) where there may be prejudicial association with codefendants; (3) where there may be likely confusion from evidence on multiple counts; (4) where there may be conflicting defenses; and (5) where there is a possibility that in a separate trial the codefendant may give exonerating testimony. (*People* v. *Massie, supra,* 66 Cal.2d at pp. 916-917.)

In arguing the motion, Boyde's counsel conceded that there was no longer an *Aranda* problem (*supra,* 63 Cal.2d 518) after Ellison's waiver of a jury trial. Counsel nevertheless argued strenuously in favor of severance on the ground of inconsistent defenses. Counsel's principal concern was about the prejudice that would result from Boyde's jury hearing Ellison's testimony. Counsel noted that the defendants' defenses were inconsistent and mutually antagonistic in that each attempted to place primary responsibility on the other for the robbery and murder.

Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, none has found an abuse of discretion or reversed a conviction on this basis. (See *People* v. *Massie, supra,* 66 Cal.2d 899; *People* v. *Turner, supra,* 37 Cal.3d 302; *People* v. *Jones* (1970) 10 Cal.App.3d 237 [88 Cal.Rptr. 871]; *People* v. *Wheeler* (1973) 32 Cal.App.3d 455 [108 Cal.Rptr. 26].) Indeed, we recently rejected such a claim in *People* v. *Turner, supra,* 37 Cal.3d at pages 311-313, where Turner presented no defense and his codefendant Souza testified that Turner was the killer and that he had assisted in the robbery because he feared Turner. We noted that there is a statutory preference for joint trials (see § 1098) and that the "instant case provided the classic situation for joint trial—defendants charged with common crimes against common victims. [¶] As to conflicting defenses, counsel could articulate no reason for separate trials except to point out that the prosecution would simply put on

its case, then sit back and watch as defense counsel became the real adversaries. Of course, if that point has merit, separate trials would appear to be mandatory in almost every case." (37 Cal.3d at pp. 312-313.)

On the basis of the showing made in *Turner* at the time of the motion—two defendants charged with murders under circumstances in which they were jointly involved and might be expected to attempt to cast primary blame on the other—we concluded that the trial court had not abused its discretion in denying separate trials. We noted, however, that such a ruling could still be the basis for reversal after trial if the reviewing court determined that, "because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law. . . . [However,] no denial of a fair trial results from the mere fact that two defendants who are jointly tried have antagonistic defenses and one defendant gives testimony that is damaging to the other and thus helpful to the prosecution." (37 Cal.3d at p. 313.)

The Ninth Circuit Court of Appeals refused to find an abuse of discretion in similar circumstances. In *United States* v. *Brady* (9th Cir. 1978) 579 F.2d 1121 (cert. den. 439 U.S. 1074 [59 L.Ed.2d 41, 99 S.Ct. 849]), each of the two defendants facing manslaughter charges defended by claiming that the other inflicted the fatal blows to the victim of their joint assault. Acknowledging the obvious hostility and conflict in the positions taken by defendants, the court found that "the prejudice which either appellant may have suffered from the testimony of the other is relatively slight. It is undisputed that each appellant participated in the incident. Consequently, it would only be natural for one to try to place the blame on the other. The jury had the responsibility of assessing each of the appellants' credibility. Moreover, the testimony of each appellant was merely cumulative of the government's case against the other and considering the simplicity of the case, there is no sound reason to suggest that members of the jury, being properly instructed as they were, could not realistically appraise the evidence against each appellant." (*Id.* at p. 1128.)

As in *Turner, supra,* 37 Cal.3d 302, and *Brady, supra,* 579 F.2d 1121, it cannot be said here that the trial court abused its discretion in denying severance or that Boyde was denied a fair trial by the procedure employed. Although the defense positions might be characterized as antagonistic on the issue of the identity of the actual killer, it was undisputed that each defendant participated in the incident. Ellison's testimony—while critical as a percipient witness in placing the gun in Boyde's hand—only corroborated the other details of the offense established by Boyde's own extrajudicial statements and physical evidence presented by the prosecution. Ellison did not present the kind of extensive evidence against Boyde which

would have turned the trial into more of a contest between the defendants than between the prosecution and either of them, and his counsel made no arguments to the Boyde jury. No evidence inadmissible as to Boyde was introduced as a result of the joint trial; Boyde himself introduced Ellison's extrajudicial statements, and Ellison was available and fully cross-examined. (See *Nelson* v. *O'Neil* (1971) 402 U.S. 622 [29 L.Ed.2d 222, 91 S.Ct. 1723].) The prosecutor did not simply sit back and let the defendants convict each other; his case-in-chief against both successfully withstood the test of sections 1118 and 1118.1, and he aggressively cross-examined Ellison as well as Boyde.

Boyde's assertions of unfair prejudice are likewise unpersuasive. He claims that Ellison's status as a defendant-witness permitted the prosecutor to benefit from Ellison's accusation against Boyde while being relieved of the responsibility of informing the jury that the testimony contained perjury. But since the prosecutor did not present Ellison's testimony, he did not impliedly vouch for its credibility. Boyde's claim that Ellison's status as codefendant prevented discovery of a secret deal between Ellison and the prosecution must fail because of the lack of any factual support in the record that such a deal in fact was made. Boyde cannot complain that he was unfairly prejudiced by his testimony, when his case was damaged by his own lack of credibility as a witness. Although Boyde may have been surprised by Lucinda Taylor's testimony that he had an opportunity to return the gun to Ellison's mother's room, he did rebut it with testimony from Preston Scott that both were in Whittier at that time. Similarly, though Boyde may have been surprised by Otharean Owens's testimony—elicited on cross-examination by Ellison's counsel—that Boyde had admitted guilt, he was able to rebut this testimony with his own witnesses who denied that he made any affirmative reply to Ms. Owens. And although the prosecutor's remarks at Ellison's sentencing hearing acknowledge the importance of Ellison's testimony in establishing Boyde as the actual killer, there was nothing improper about this testimony at a joint trial.

B. *Alleged "Secret Deal" Between Ellison and Prosecutor.*

▉▉▉ Boyde claims the prosecutor's failure to disclose an inducement given for Ellison's testimony constituted the suppression of substantial material evidence relating to the credibility of a key witness which denied him due process of law. (*People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341, A.L.R.4th 3132]; see also, *People* v. *Phillips* (1985) 41 Cal.3d 29, 45-49 [222 Cal.Rptr. 127, 711 P.2d 423].) Although Ellison was not called as a witness for the prosecution, and although no plea bargain was entered, Boyde asserts that Ellison's decision to waive jury and submit to a court trial and his decision to testify in his own defense were

prompted by an express or implied agreement that the prosecutor would not seek the death penalty against Ellison, and would agree that any special circumstances found true as to Ellison should be stricken.

■ In *People* v. *Ruthford* we held that the duty on the part of the prosecution to disclose all substantial material evidence favorable to an accused extends to disclosure of evidence which relates to the credibility of a material witness and that the suppression of substantial material evidence bearing on the credibility of a key prosecution witness constitutes a denial of due process within the meaning of the Fourteenth Amendment to the United States Constitution. (14 Cal.3d at pp. 406, 408.)

To demonstrate the existence of a "secret deal" between the prosecutor and Ellison, Boyde quotes from the statements of counsel and the district attorney made at the time of the jury waiver and later at Ellison's sentencing hearing.

On October 6, 1981, while hearing another motion pertaining only to Ellison, counsel announced that Ellison had elected to waive jury trial. The prosecutor joined in the waiver as to trial on guilt, special circumstances, and penalty. The prosecutor stated on the record "this is not a slow plea by any stretch of the imagination, and there are no concessions being made by either side, and it will be anticipated a fully contested trial down the line on the issue of guilt." The prosecutor also stated, "As the Court well knows, and since there will not be picking a jury, there will be no evidence presented in aggravation other than the facts of the crime and the special circumstances. [¶] While I—I'm not going to come out in court and concede something at this point in time—it suggests to me that at some point in time the law is going to require the Court—will not put the Court in a position to come back with a finding of death in this case. [¶] We would not be willing to waive jury to put you in that kind of a predicament in a case like this. [¶] I think it is not part of the negotiations for the jury waiver, or anything else. It is just an understanding that there will be no further evidence in aggravation, and that as I interpret the factors under 209 [*sic*] of the Penal Code, the Court will be required as a matter of law, to come back if, in fact, special circumstances are found, of course, with life without parole, and I wanted the Court to be aware of that." Ellison's counsel then commented that "Mr. Ellison will take part in the regular full-blown trial. There's been no concessions made by the District Attorney. In fact, it was after a little agonizing soul searching and conferences that my proposal to waive jury was accepted by him, and then I had to reconsider all the facets. [¶] We will take part in the trial. Evidence will be presented and Mr. Ellison will testify."

The court, in taking Ellison's waiver of constitutional rights, informed Ellison that under the court's prior rulings the special circumstances would be applicable even if he had not actively participated in the murder and that he therefore faced a potential sentence to prison for life without possibility of parole.

Boyde also points to statements made by Ellison's counsel in closing argument to the court: "This was a pretty unique case to me. I've defended a lot of them but never assisted in the prosecution of one and during this trial, I did have the opportunity to cross-examine Mr. Boyde and this sort of thing. [¶] Without Mr. Ellison, I think possibly Mr. Ellison's cooperation and assistance, I think possibly it would have been very difficult—maybe not impossible, but it would have been difficult to have a verdict of guilty come in on Mr. Boyde. [¶] But all those things aside, there was no plea bargain struck. Plea bargains are not struck in cases such as this. There was no plea bargain and no assurances made."

At the sentencing hearing on June 21, 1982, Ellison's counsel reiterated: "Mr. Ellison cooperated after he finally realized his uncle, Richard Boyde, the codefendant, was taking him down with intent. Mr. Ellison has been helpful. I believe that it would have been a great—there would have been a great deal of difficulty, not impossibility, but difficulty in convicting Mr. Boyde without Mr. Ellison's assistance. [¶] Mr. Ellison's testimony, I believe, was the turning point in making Mr. Boyde come forth and begin to show his true colors." Ellison's counsel thereupon urged the court to strike the special circumstances and the prosecutor agreed, stating: "In large part, I think Richard Boyde—the conviction of Richard Boyde—resulted proba-. bly, even perhaps unintentionally from the posture Mr. Ellison and his attorney took in this case. Had Mr. Ellison not waived jury and obviously streamlined the entire proceeding, the case could have been severed.

"I don't think the Boyde jury would have then heard Ellison's statements made to the police officers on tape. They would not have been able to compare Ellison's statements with Boyde's statements. They would not have had Boyde's testimony. . . . And once they got to see what Mr. Boyde was really all about, and they got to hear the respective knowledge about the facts of the case, that each of the two defendants had, it became clear that Mr. Boyde was the killer and more culpable.

"So Mr. Ellison has, perhaps not intentionally, done a tremendous service to the People of the State of California by his posture in this particular case." The prosecutor also argued that Ellison was less culpable for the murder and concluded, "I believe that if this defendant is sentenced to a 25

to life sentence, rather than a Life Without Parole, justice will have been served, or at least not disserved."

■ The weakness of Boyde's argument lies in the fact that the record contains no direct evidence or admission of the existence of an agreement, but does contain express denials. While the facts recited by appellant would be consistent with the existence of an agreement, both the district attorney and defense counsel stated that no agreement had been made. The court never inquired on the record into the nature and extent of the discussions between Ellison and the district attorney leading to the mutual waiver of jury trial on guilt, special circumstances and penalty. Although Boyde's counsel was absent when the waiver was made, he did not raise the question on any other occasion and never suggested there had been a "secret deal." The district attorney's position regarding the appropriate sentence for Ellison remained consistent throughout the prosecution: he charged only Boyde with personal use of a firearm and had apparently determined that Boyde was the leader and actual killer.

The fact that Ellison later successfully moved to have his conviction reduced to second degree murder, pursuant to *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], and that the district attorney at that time agreed the reduction would be appropriate, is not determinative either. The district attorney's position as to the relative culpability of the codefendants remained consistent.

On this record, we cannot conclude that there was an agreement between Ellison and the prosecutor which was not disclosed to Boyde.

C. *Voluntariness of Boyde's Statements.*

Boyde challenges the admission of his various statements to the police, claiming they were not proved beyond a reasonable doubt to have been voluntarily given. (*People* v. *Jimenez, supra,* 21 Cal.3d 595.) Specifically, he argues that: (1) the January 22 statement in which he admitted knowledge of the 7-Eleven robbery-homicide was induced by an implied promise of leniency with regard to the charges arising out of the gas station robbery-kidnapping (*People* v. *Jimenez, supra,* 21 Cal.3d at pp. 611-612); (2) he did not waive his rights with regard to the offense of murder (see *U.S.* v. *McCrary* (5th Cir. 1981) 643 F.2d 323, 328); (3) the statement was given while he was in a state of extreme emotional upset and was not therefore the " ' "product of a rational intellect and a free will" ' " (*People* v. *MacPherson* (1970) 2 Cal.3d 109, 113 [84 Cal.Rptr. 129, 465 P.2d 17]; *In re Cameron* (1968) 68 Cal.2d 487, 498 [67 Cal.Rptr. 529, 439 P.2d 633]); (4) the January 23 statements in which he admitted involvement in the robbery-homicide

were the fruits of the earlier, involuntary statement (*People* v. *Braeseke* (1979) 25 Cal.3d 691, 703-704 [159 Cal.Rptr. 684, 602 P.2d 384]); and (5) the final statement on January 23, in which he confessed the 7-Eleven robbery was induced by police deception as to the legal consequences of his prior admission of some involvement (see *People* v. *Disbrow* (1976) 16 Cal.3d 101, 112, fn. 12 [127 Cal.Rptr. 360, 545 P.2d 272]).

■ "It is axiomatic that the use in a criminal prosecution of an involuntary confession constitutes a denial of due process of law under both the federal and state Constitutions. [Citations.] In California, before a confession can be used against a defendant, the prosecution has the burden of proving that this was voluntary and was not the result of any form of compulsion or promise of reward. [Citations.]" (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 602.) The prosecution bears the burden of proof, and the proof must establish voluntariness beyond a reasonable doubt. (*Id.* at p. 608.) At the trial level, the determination is made by the trial court outside the presence of the jury. (*People* v. *Jimenez, supra,* at p. 604.) The appellate court must examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found. With respect to conflicting testimony, the appellate court accepts that version of the facts most favorable to the finding below, to the extent it is supported by the record. (*Id.* at p. 609.) Here the trial court found beyond a reasonable doubt all statements were voluntary.

### 1. *Implied Promise of Leniency on Gas Station Charges.*

■ In general, a confession is considered voluntary "if the accused's decision to speak is entirely 'self-motivated' [citation], i.e., if he freely and voluntarily chooses to speak without 'any form of compulsion or promise of reward. . . .' [Citation.]" (*People* v. *Thompson* (1980) 27 Cal.3d 303, 327-328 [165 Cal.Rptr. 289, 611 P.2d 883].) However, where a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law. (*People* v. *Brommel* (1961) 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845].) Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise, does not, however, make a subsequent confession involuntary. (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 611.)

■ Boyde claims that his initial statement admitting knowledge of the Gibson robbery-homicide was induced by an implied promise that a statement would lead to more favorable disposition of the charges of robbery and kidnapping for robbery of Baker, for which he had been arrested.

Because Detective Callow admitted that he considered appellant a potential suspect in the Gibson homicide at the time of the January 22 interview regarding the Baker robbery-kidnapping, Boyde asserts the officer was motivated by a desire to obtain an incriminatory statement. Further, although Callow repeatedly informed Boyde that the police could not promise leniency but could only pass any information along to the district attorney who had the authority to make such an offer, Boyde argues Callow "made it crystal clear" that he had "no hope of anything other than incarceration" unless he gave a statement on the homicide. (See *In re Roger G.* (1975) 53 Cal.App.3d 198 [125 Cal.Rptr. 625].)

The argument is unpersuasive. The evidence shows that there was no promise of leniency, no attempt to induce a confession, and no confession. Appellant initiated discussion of the homicide because of his own hopes of obtaining leniency on the robbery-kidnapping charges. The statement he gave was neither a confession nor an admission, but an attempt to lay blame for the crime on "Big Mike" and Ellison. Detective Callow's role in eliciting the story was responsive rather than aggressive, and he repeatedly and clearly stated that he had no authority to make any promise of leniency regarding the pending robbery-kidnap charges, but could only pass information on to the district attorney.

The cases upon which Boyde relies are inapposite. In *In re Roger G., supra,* 53 Cal.App.3d 198, for instance, officers engaged in a lengthy effort to induce a minor to abandon his claim of innocence of a shooting for which he had been arrested. They told him he might be incarcerated for " 'seven or eight or ten or life, you know . . .' " and said, " '. . . it's gonna help you out for a chance of probation or getting parole if you are honest about the thing. . . . [but] if you go in there . . . and . . . try to cover up, do you think we'd give you a chance at probation or parole? No way.' " Although they subsequently stated they could not promise probation or parole, that it was only a possibility, the appellate court found the evidence established an "implied, if not express threat of harsher punishment if Roger did not confess, and an implied, if not express, promise of the possibility of more lenient treatment if he did." (*Id.* at pp. 200-202.) And although dictum in *People* v. *Nelson* (1964) 224 Cal.App.2d 238 [36 Cal.Rptr. 385] indicates that a confession to crimes for which defendant was arrested might be involuntary if induced by promises of lenient treatment on an unrelated pending charge, that is not the factual posture of appellant's case.

At the time of his January 22 statement Boyde made a voluntary, if unwise, decision to offer false information in hope of obtaining favorable treatment. The trial court's determination that the statement was voluntary beyond a reasonable doubt is correct.

### 2. *Failure to Inform Appellant He Was Suspected of Murder.*

■ Boyde argues that the failure to inform him he was a suspect in the robbery-murder rendered his January 22 statement involuntary because his decision to waive his rights to remain silent and to consult counsel was not made knowingly, intelligently and voluntarily. He acknowledges that no California decision had held that *Miranda* warnings (*Miranda* v. *Arizona, supra,* 384 U.S. 436) must specify the actual charge pending against the person being interrogated and that the Court of Appeal rejected such an argument in *People* v. *Neely* (1979) 95 Cal.App.3d 1011, 1017 [157 Cal.Rptr. 531]. He also acknowledges that the Court of Appeal has held that new *Miranda* warnings are not necessarily required whenever an interrogation about one crime leads to discussion of another. (*People* v. *Schenk* (1972) 24 Cal.App.3d 233, 236 [101 Cal.Rptr. 75].)

He urges that the position taken by a minority of courts which require such information to implement *Miranda* is the better approach. Boyde relies upon *United States* v. *McCrary, supra,* 643 F.2d 323, *Schenk* v. *Ellsworth* (D.Mont. 1968) 293 F.Supp. 26, and *Commonwealth* v. *Dixon* (1977) 475 Pa. 17 [379 A.2d 553]. The argument does not fit the facts of this case. On January 22 Boyde volunteered information about these crimes, and as noted above, admitted no complicity but claimed to know that others had committed the offenses. This statement was damaging because it led directly to the later statements in which Boyde admitted his guilt, but was incriminating only by comparison to those later statements.

### 3. *Boyde's Capacity to Make a Knowing and Voluntary Waiver.*

■ Boyde asserts that his January 22 statement was taken within minutes after he was removed from the holding cell "because he was completely unnerved by an apparent attack of claustrophobia, and in terror of being incarcerated in the Riverside County Jail." He cites Detective Callow's description of his "very hyper, very nervous condition" to show that his decision to give a statement was not " ' "the product of a rational intellect and a free will." ' " (*People* v. *MacPherson, supra,* 2 Cal.3d at p. 113; *In re Cameron, supra,* 68 Cal.2d at p. 498.)

The evidence does not indicate Boyde was so distraught that his will to resist confession was overborne. Detective Callow testified that Boyde seemed to calm down after being removed to an interview room and being given coffee and a cigarette. Boyde presented no contradictory evidence. There was no indication of intoxication or mental illness.

4. *The January 23 Statements as Fruit of the January 22 Statement.*

■ This argument falls with the conclusion that the January 22 statement was voluntarily given.

5. *January 23 Confession Induced by Misrepresentation of Detectives Lund and Ropac.*

When Detectives Lund and Ropac approached Boyde on January 23 they first told him they thought the story he told Callow was not truthful. They asked if he was willing to talk with them again about the robbery-homicide and when he indicated he would, took a full *Miranda* waiver. Boyde then told his second story. He admitted he had been with Ellison and Big Mike at the 7-Eleven, that Big Mike had pulled the robbery and that he (Boyde) had driven the car from the store to the orange grove. But he claimed he did so under protest, denied assisting in the killing and denied any advance knowledge of Big Mike's intent to rob or kill.

■ Boyde claims that at the conclusion of this statement Lund told him it amounted to a full confession, that he believed Boyde had in fact been more deeply involved than he had admitted, and that any further statement could not result in any greater liability than he had already incurred. After this confrontation Boyde told his final version, which implicated him at least as an accomplice in the robbery and felony murder. Boyde contends this incriminating statement was induced by Lund's misrepresentation as to the legal effect of the prior statement, and that this deception amounts to psychological coercion which rendered the statement involuntary. (See *People* v. *Hogan* (1982) 31 Cal.3d 815, 840-841 [183 Cal.Rptr. 817, 647 P.2d 93].)

Boyde's description of the encounter is factually inaccurate. The transcript of the interview shows that at the conclusion of the "I was just along for the ride" story, Lund stated: "I'll tell you the problems I'm having, and, and I'm no lawyer, but I would think . . . what bothers me is you, you got such great detail, you sure you weren't in the store? You sure you didn't walk in?" Boyde repeated he had not gone in. Lund continued questioning whether Boyde might have been in the doorway of the store and whether he could have seen the money go into the bag or heard Big Mike saying it was a robbery without having been in the store. Finally, Lund stated: "It doesn't make no difference whether you were sitting in the car the whole time or whether you were right in Big Mike's back pocket, you're, you're involved in this the same, if everything else is the truth. . . ."

While Lund made it clear he believed appellant was more deeply involved in the crimes than he was admitting, he did not tell Boyde that his prior statement amounted to a confession or that any further statement could not result in any greater liability. Lund's statements amounted to harsh questioning, but did not rise to the level of psychological coercion or misrepresentation of the legal consequences of appellant's prior statement.

### D. *Admission of Prior Conviction.*

The prosecutor offered evidence of the circumstances of appellant's 1976 robbery and kidnapping of Lou Creech pursuant to Evidence Code section 1101, subdivision (b) to show appellant's identity as the perpetrator of the Baker offenses, to show his identity as the dominant figure in the Gibson robbery-murder, to show that appellant participated in the Gibson offenses with the intent to commit robbery and kidnapping for robbery, and to show that appellant had a motive for killing Gibson. The trial court found that the prior and charged offenses shared a sufficient number of distinctive common marks to establish a unique modus operandi, that the evidence of modus operandi was relevant to the material issue of appellant's identity as the perpetrator of the Baker robbery-kidnapping, and that the evidence was relevant to show Boyde's intent, if he was found to be an aider and abettor in the Gibson incident, or, alternatively, to show that he was the leader in perpetration of that crime.

 Boyde contends the 1976 and 1981 7-Eleven offenses lacked sufficient common, distinctive marks to establish a modus operandi, that the evidence was merely cumulative on the question of the identity of the participants in the Gibson offenses, that the evidence had no significant probative value regarding the identity of the actual killer of Gibson, and that the trial court failed to properly weigh the prejudicial effect of the prior crimes evidence against its probative value pursuant to Evidence Code section 352.

We need not determine the merits of this contention since it is clear that any error in admitting the evidence was harmless. There is no reasonable probability that Boyde would have obtained a more favorable result had the evidence been excluded. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Boyde's defense was damaged beyond repair, even without consideration of the prior crime, by Ellison's testimony, inferences from the placement of the footprints in the orange grove, and Boyde's extensive knowledge of the details of the robbery and shooting.

### E. *Erroneous Jury Instruction.*

█ Boyde claims the trial court erred in giving CALJIC No. 2.27—which permits proof of any fact by the testimony of a single witness[4] in this case where critical evidence on a central issue came from an accomplice whose testimony is required by law to be corroborated (§ 1111; CALJIC Nos. 3.11, 3.18). Although the court also instructed on the principles that an accomplice's testimony should be viewed with caution (CALJIC No. 3.18), that a defendant cannot be convicted on the testimony of an accomplice unless that testimony is corroborated (CALJIC No. 3.11), and that if anyone committed the robbery, kidnapping and murder Ellison was an accomplice as a matter of law, Boyde claims No. 2.27 effectively nullified these instructions.

This claim is unpersuasive. Although Boyde is correct that use of No. 2.27 is discouraged in cases where one witness's testimony requires corroboration (see use note to CALJIC No. 2.27 (4th ed. 1979)), so long as the appropriate instructions on the use of accomplice testimony are given, the giving of No. 2.27 is not error. (*People v. Cooks* (1983) 141 Cal.App.3d 224, 333 [190 Cal.Rptr. 211]; *People v. Stewart* (1983) 145 Cal.App.3d 967, 974-975 [193 Cal.Rptr. 799].)

### F. *Carlos Error.*

█ Boyde contends that the court prejudicially erred under *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], in failing to instruct the jury that it could not find the felony-murder special circumstances true unless it found that defendant intended to kill at the time of the homicide. His contention must be rejected.

In *People v. Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306], we held that, with respect to the actual killer, the court need not instruct on intent to kill in connection with felony-murder special circumstances. Such an instruction is required only when there is evidence from which the jury could find that the defendant was an accomplice rather than the actual killer. Although an instruction was warranted on the basis of Boyde's testimony that he was not the killer, the error in failing to give it was cured by the jury's special verdict that Boyde "personally killed Dickie Lee Gibson with express malice aforethought and premeditation and deliberation."

---

[4]CALJIC No. 2.27 provides: "Testimony which you believe given by one witness is sufficient for the proof of any fact. However, before finding any fact [required to be established by the prosecution] to be proved solely by the testimony of such a single witness, you should carefully review all the testimony upon which the proof of such fact depends."

Boyde nevertheless argues that he should not be bound by this finding because he did not have reasonable advance notice that the special verdict would be presented to the jury. We do not agree. Boyde argued throughout pretrial proceedings that it would be unconstitutional to impose the death penalty in the absence of proof that he actually killed or intended that a killing occur. He addressed the issue in his defense testimony by denying any knowledge or intent that a killing would occur. Thus he was neither unfairly surprised nor denied an opportunity to present all the evidence at his command on the issue of intent. The trial court instructed the jury on premeditated and deliberate murder and malice aforethought, as well as felony murder; all of the elements of the special verdict were explained to the jury.

## IV. JURY SELECTION ISSUES

### A. Challenge to Death-qualification of Guilt Phase Jury.

■ Boyde claims that removal from the guilt phase jury of 11 persons who would automatically vote against death at the penalty phase but who could render an impartial verdict on the issue of guilt or innocence violates the constitutional requirement that his jury be drawn from a fair cross-section of the community and his constitutional right to trial by an impartial jury. These claims have been rejected by both this court and the United States Supreme Court. (*Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]; *People* v. *Fields* (1983) 35 Cal.3d 329, 374 [197 Cal.Rptr. 803, 673 P.2d 680] (Kaus, J., conc.); *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301].)

### B. Use of Peremptory Challenges to Exclude Persons With Reservations About the Death Penalty.

■ Boyde argues that the prosecutor's use of peremptory challenges on all prospective jurors with reservations about the death penalty denied him an impartial jury on the issue of penalty and constituted group bias in violation of *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. We have previously rejected this argument in *People* v. *Zimmerman* (1984) 36 Cal.3d 154, 160-161 [202 Cal.Rptr. 826, 680 P.2d 776] and *People* v. *Turner, supra,* 37 Cal.3d at pages 313-315.

### C. Witherspoon Error.

■ Boyde contends that three jurors were improperly excused under *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. He asserts that the jurors had not made it "unmistakably clear" that they

"would *automatically* vote against the imposition of capital punishment without regard to the evidence that might be developed at the trial . . . ." (*Id.* at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) The United States Supreme Court recently modified the *Witherspoon* standard in *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], and we adopted that modification in *People* v. *Ghent* (1987) 43 Cal.3d 739, 767-769 [239 Cal.Rptr. 82, 739 P.2d 1250]. The new standard is whether a juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852].) "[I]n addition to dispensing with *Witherspoon*'s reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." (*Ibid.* [83 L.Ed.2d at p. 852].) Our task on review is to examine the context surrounding the juror's exclusion to determine whether the trial court's decision that the juror's beliefs would "substantially impair the performance of his duties as a juror" is fairly supported by the record. (*Darden* v. *Wainwright* (1986) 477 U.S. 168, 175 [91 L.Ed.2d 144, 153-154, 106 S.Ct. 2464, 2469].)

### 1. *Prospective Juror Warren.*

 Although prospective juror Warren gave some seemingly equivocal answers earlier, his final answer was quite clear. The court asked Warren whether he could "under any circumstances return a verdict that would result in the death penalty for Mr. Boyde or anyone." Warren responded, "I can't do it, sir." He was then excused for cause. His excusal was proper under either the *Witt* or *Witherspoon* standard.

### 2. *Prospective Juror Bennett.*

Prospective juror Bennett was initially unclear as to whether he was unequivocally opposed to the death penalty. His later responses, however, revealed his clear opposition to the death penalty. In reply to questions from both defense counsel and the prosecution about whether he would impose the death penalty if he found that the evidence in aggravation outweighed the evidence in mitigation, he stated that he would not, regardless of the severity of the evidence in aggravation. Prospective juror Bennett also said he could think of no circumstance where he could personally vote for the death penalty. He was thereafter excused. The record supports the trial court's excusal in that it demonstrates that prospective juror Bennett's views would " 'substantially impair the performance of his duties as a juror

in accordance with his instructions and his oath.'" (*Wainwright* v. *Witt, supra,* 469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852].)

### 3. *Prospective Juror Warne.*

Prospective juror Warne testified to having "mixed feelings" about the death penalty, and stated, "I don't know that taking a life is a proper form of punishment." When asked whether she personally could return a verdict that would result in the death penalty, she responded, "No, I don't think so." She stated that the way she felt "right now" was that she would not under any circumstances return a death verdict. She further stated that her ideas might change, that she had no way of knowing if they would, but that she was not convinced that taking another life "is the way to go."

Defense counsel then sought to explain the balancing of aggravating factors against mitigating factors, but gave an explanation later determined to be inaccurate in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440] (revd. on other grounds *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]). Counsel stated that if a juror weighed the evidence and determined that the evidence in aggravation outweighed the evidence in mitigation, "the law mandates that you come in with a finding of death, no matter what your personal feelings may be." Under those circumstances he asked if she could impose a death penalty, and Ms. Warne replied, "No, I don't think I could."

In response to the district attorney, Ms. Warne stated that she could perhaps conceive of voting for death if a crime were committed against one of her children, but could think of no other situation. Finally, the district attorney reiterated that the law requires a death verdict where aggravation outweighs mitigation, "even if you personally don't think the crime is worth it . . ." and asked whether she would be able to follow her oath as a juror and return the verdict. She replied that she could not: "No, couldn't do it. I would have to disobey."

Prospective juror Warne's responses indicated that she would "*automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at trial." (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) The only situation in which she would be willing to vote for the death penalty was one which she would never encounter, since she would never be permitted to be a juror in a case involving a crime against her child. The fact that defense counsel and the prosecutor may have misstated the decisionmaking process under *People* v. *Brown, supra,* 40 Cal.3d 512, does not alter our conclusion. The question at hand was whether prospective juror Warne would be willing to

follow the law and vote to impose the death penalty in an appropriate case. She indicated that she would not, and that qualified her for excusal under *Wainwright* v. *Witt, supra,* 469 U.S. 412.

## V. Penalty Phase Error

### A. *Facts.*

#### 1. *Prosecution Evidence.*

As evidence in aggravation, the prosecutor presented testimony by victims of past offenses committed by defendant, testimony by Boyde's California Youth Authority (CYA) parole officer as to his conduct while on parole, and evidence of Boyde's plan to escape from jail during the trial of the instant charges.

Katherine Hagen testified that Boyde robbed her on June 26, 1976, while she was working at the Circle K Market in Riverside. Mark Page testified that he was robbed by Boyde on July 15, 1976, while he was working at a 7-Eleven store on Pine Street in Riverside. Tim Hanks testified that Boyde robbed him on July 16, 1976, while he was working at a 7-Eleven store on Wells Street in Riverside. Charles Skalf testified that he was robbed by Boyde on July 19, 1976, at a Winchell's Donut store. Edward Wall testified that Boyde robbed him on July 19, 1976, at a 7-Eleven store on Van Buren Street in Riverside.

Colleen Dietzman and Karen Smith testified that Boyde participated in an assault on them at Ramona High School in 1974. Mary Matlock testified that Boyde was in a group which was throwing bricks at her car in 1974.

Robert Gomez, Boyde's CYA parole officer, testified that Boyde was committed to CYA in 1972 on charges which included escape from juvenile hall and receiving stolen property. Boyde was recommitted in 1974 for assault and throwing an object at a vehicle. Gomez stated that Boyde failed to report for required meetings, failed to make diligent effort to find work, and generally failed to make "any offer to rehabilitate himself or engage in any kind of productive conduct."

Testimony from three police officers regarding their contacts with Boyde included information about Boyde's untruthfulness (Detective Smith), Boyde's possession of stolen property (Detective Knofflock), and his possession of marijuana in jail (Deputy Nelson).

Evidence of Boyde's escape plan consisted of two letters he had written and testimony by two fellow jail inmates that Boyde planned to escape from the roof of the jail and use a gun to subdue the guard if necessary. Although the plan never ripened into an attempted escape, the trial court permitted the evidence on the theory that Boyde and Cecil Moore had entered into a conspiracy to effect Boyde's escape.

Ronnie English, who was serving a jail term for assault, testified as follows: He became friendly with Moore while working in the jail kitchen. Moore had known both Ellison and Boyde for a long time. English saw Moore read a letter he had received from Boyde and, at Moore's request, helped him read the letter and a map. He discussed the plan with Moore, and Moore told him that he was going to help Boyde. English saw Moore receive a second letter from Boyde. After the second letter Moore told him he wanted no part of Boyde's plan to kill the deputy. Therefore he would just leave the gun and the wirecutters on the roof, but he would not wait on the roof all night as Boyde requested. English reported the letters to jail authorities who then photocopied them and returned them to Moore's cell. English was never part of the conspiracy.

Moore testified that he had talked with Boyde about the escape plan before receiving the letters. Although he had told Boyde he would help him, he changed his mind when he read the first letter which talked about killing the deputy. Later, however, on cross-examination Moore said that from the start he had never intended to help Boyde escape.

Deputy Baker, who was familiar with Boyde's handwriting from her censorship of his mail, identified the handwriting on the two letters as Boyde's. Sargent Zavetz testified that English had passed the escape plan letters to him and corroborated information in the letters about the jail routines and layout.

To fend off the prosecutor's offer to produce a parolee who had allegedly purchased a gun for use in the escape, Boyde's counsel stipulated that the publication of the letters would constitute an overt act for purposes of establishing the conspiracy.

2. *Defense Evidence.*

Boyde presented testimony by his mother, two sisters, stepfather, ex-girl-friend and her mother, and his wife. His family was poor; he did not know his father; his mother had little education and worked as a domestic. Boyde had health problems from a young age and did poorly in school. As a young teenager he began to skip school, stay out late, and have trouble with the

police. The family was not able to obtain counseling through the school system and could not afford to do so privately. Boyde had few friends and was uncomfortable with the strictness of his stepfather who came into the home when he was eight. Boyde's former girlfriend and his sister both testified that they found him to be a giving person, good with children and good to them. His wife testified that he had looked hard for work after his release from prison in November 1980, but his efforts were unsuccessful. She married him after his arrest for these crimes and was shocked at the crimes he was accused of because it seemed so unlike him.

A psychologist testified that Boyde has an inadequate personality with limited internal resources and low self-esteem. He is often depressed and is socially isolated. Boyde's intelligence level is on the edge between dull-normal and borderline.

B. *Improper Evidence in Aggravation.*

■ Boyde correctly contends that certain evidence was improperly admitted because it did not relate to any of the statutory aggravating factors. (See *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782].) Most of the evidence presented about Boyde's CYA commitment and parole falls into this category in that it did not pertain to a prior felony conviction (§ 190.3, factor (c)) or criminal activity involving force or violence (§ 190.3, factor (b)). The same may be said for testimony by officers about Boyde's untruthfulness, possession of stolen property and possession of marijuana in jail. Also improper was testimony by victims of other offenses about the impact that the event had on their lives.[5]

Evidence of two other incidents was improperly admitted because the prosecution had failed to give proper notice, as required by section 190.3. Those incidents were the 1974 assault on Colleen Dietzman and Karen Smith and the 1976 robbery of Edward Wall.

■ We do not agree, however, with Boyde's contention that evidence of the escape plan was improperly admitted. Contrary to Boyde's claim, violent criminal activity need not have preceded the charged crimes to be admissible under section 190.3, factor (b). (See *People* v. *Balderas* (1985) 41

_____

[5] The testimony also was arguably improper under *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], which condemned the admission of detailed testimony at the penalty phase by family members regarding the impact that the victim's death had had on their lives. Unlike *Booth,* the testimony here was by the actual victims themselves who in the course of describing Boyde's criminal conduct also mentioned the effect it had on them. The improper testimony was far more fleeting than that in *Booth* and, in our view, could not have affected the verdict.

Cal.3d 144, 202 [222 Cal.Rptr. 184, 711 P.2d 480].) The plan called for use of a gun to subdue the guard if necessary and thus met the force or violence requirement for admissibility under factor (b). The remaining question is whether the evidence revealed the technically complete crime of conspiracy to qualify as "criminal activity" under factor (b). (See *People* v. *Phillips, supra,* 41 Cal.3d at p. 72.)

Boyde contends that a technically complete crime was not shown because there was no independent evidence of the agreement and no overt act in furtherance of the conspiracy was established. (See Evid. Code, § 1223; *People* v. *Leach* (1975) 15 Cal.3d 419, 430-431, fn. 19 [124 Cal.Rptr. 752, 541 P.2d 296].) He is mistaken. He stipulated that the sending of the letters constituted the overt act. As to the agreement, Moore's actions are sufficient circumstantial evidence to show the agreement since all that is necessary is a prima facie showing before consideration of a coconspirator's admissions. (See *People* v. *Jourdain* (1980) 111 Cal.App.3d 396, 404-406 [168 Cal.Rptr. 702]; *People* v. *Perez* (1978) 83 Cal.App.3d 718, 728-730 [148 Cal.Rptr. 90].) Here we have Moore's receipt of Boyde's letter, his reading and studying it with English, their discussion of the maps and plans, and Moore's receipt of the second letter. Moore told English after receipt of the first letter that he was going to help Boyde. The fact that Moore testified that he never planned to help Boyde does not nullify the other evidence of his agreement; it merely went to the weight of the evidence for the jury to consider in determining whether the conspiracy had been proved beyond a reasonable doubt. The instructions on conspiracy were sufficient; sua sponte instructions on the elements of the offense were not required. (See *People* v. *Phillips, supra,* 41 Cal.3d at p. 68.)

▇▇▇▇▇ The evidence that was improperly admitted in aggravation was relatively insignificant in light of the properly admitted evidence of Boyde's commission of a string of four robberies in 1976, his involvement in the brick-throwing incident in 1974, and his conspiracy to escape from the jail while the current charges were pending. We therefore conclude that the improperly admitted evidence could not have affected the verdict or have misled the jury in its penalty determination.

C. *Jury Instructions.*

1. *Factor (k).*

The court gave the complete version of CALJIC No. 8.84.1 as it read before its amendment in response to our suggestion in *People* v. *Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813], for clarification of the factor (k) of section 190.3 (hereafter referred to as

factor (k)). The version of factor (k) that was given read: "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." CALJIC No. 8.84.1 has since been amended to add the following phrase to factor (k): "and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (1986 rev.)

■ Boyde contends that the unadorned version of factor (k) that was given may have misled the jury into thinking it could not consider evidence relating to his background and character. We do not agree. The jury was instructed to consider "all of the evidence which has been received during any part of the trial of this case." All of the defense evidence at the penalty phase related to Boyde's background and character. Although the prosecutor argued that in his view the evidence did not sufficiently mitigate Boyde's conduct, he never suggested that the background and character evidence could not be considered. Defense counsel argued at length for giving great weight to defendant's troubled background and personality deficiencies and referred to factor (k) as the catchall provision. It is inconceivable the jury would have believed that, though it was permitted to hear defendant's background and character evidence and his attorney's lengthy argument concerning that evidence, it could not consider that evidence.

2. *Antisympathy.*

■ No antisympathy instruction (CALJIC No. 1.00) was given at the penalty phase, but it was given at the guilt phase. For reasons stated above, we do not think that a reasonable juror would have believed he was not allowed to consider sympathy for the defendant at the penalty phase. Although the prosecutor argued against basing the weighing process on "emotion, sympathy, pity, anger, hate or anything like that because it is not rational if you make a decision on that kind of basis," the thrust of his argument was to implore the jury to make a reasoned decision, to rationally evaluate the evidence.

3. *Failure to Edit CALJIC No. 8.84.1.*

■ Boyde contends the court should have deleted all inappropriate mitigating factors from the instruction. We rejected an identical claim in *People* v. *Ghent, supra,* 43 Cal.3d 739, 776.

■ Boyde also contends the trial court should have modified the instruction to make it clear that section 190.3, factor (c) applied only to items that were not already covered by factors (a) and (b). We discussed a similar

claim in *People* v. *Melton* (1988) 44 Cal.3d 713, 764-765 [244 Cal.Rptr. 867, 750 P.2d 741], and concluded that although factor (a) ("circumstances of the crime of which the defendant was convicted in the present proceeding") is limited to the charged crimes whether or not violent, factors (b) (violent criminal activity) and (c) (prior felony convictions) may properly overlap when a prior felony conviction involved force or violence. Thus the only clarification called for was that the charged crimes should be considered only under factor (a). We do not believe, however, that a reasonable jury would have considered the circumstances of the crime more than once.

### 4. *Excessive Special Circumstances.*

Boyde contends that the trial court erred in submitting both the robbery and kidnapping-for-robbery special circumstances to the jury because the offenses were committed as part of a single, indivisible course of criminal conduct. We rejected a virtually identical claim in *People* v. *Melton, supra,* 44 Cal.3d 713, 765-769.

### 5. *Instruction on Weighing Aggravating and Mitigating Circumstances.*

The jury was instructed in the language of section 190.3 (former CALJIC No. 8.84.2) as follows: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." Boyde contends that the jury was thereby misled as to its role in determining the appropriateness of the death penalty.

In *People* v. *Brown, supra,* 40 Cal.3d at pages 538-545, we concluded that the directive of section 190.3 that the trier of fact "shall impose a sentence of death" if it "concluded that the aggravating circumstances outweigh the mitigating circumstances" did not impermissibly restrict the jury's constitutional sentencing discretion. We rejected the defendant's proffered mechanistic construction of the words "outweigh" and "shall" in favor of one which directed the jury to weigh the various factors and determine under the relevant evidence which penalty is appropriate in a particular case. We noted, however, that the statutory language—particularly the words "shall impose"—left room for confusion about the jury's role and therefore directed courts in the future to instruct on the scope of the jury's discretion. As to cases tried before our opinion, we concluded that each must be examined on its own merits to determine whether the sentencer may have been misled to the defendant's prejudice regarding the scope of its sentencing discretion. (*Id.* at p. 544, fn. 17.)

Our concerns in *Brown* were essentially two: The first was that the jury might be confused about the nature of the weighing process, that it is not a mere mechanical counting of factors on each side of an imaginary scale but rather a mental balancing process. Our second concern was that use of the word "shall" might mislead the jury as to the substance of the ultimate determination it was called upon to make. In *Brown,* we concluded that the statutory language "should not be understood to require any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances. Thus the jury, by weighing the various factors, simply determines under the relevant evidence which penalty is appropriate in the particular case." (40 Cal.3d at p. 541.)

In the present case, both the prosecutor and defense counsel repeatedly told the jury that the weighing process was just that, not a counting process, and that one mitigating circumstance could outweigh a number of aggravating circumstances. They also made it clear that the jury was free to assign whatever weight it wanted to any particular factor. Although the prosecutor argued that the jury was obliged (i.e., it "shall") to return a death verdict if it found that the aggravating factors outweighed the mitigating even slightly, he also told the jury that its ultimate determination was: "Is this the case, is this the kind of case as I am guided by these factors that warrants the death penalty." In his final summation, the prosecutor stated, "and the point now becomes, and the only question is, should it [the death penalty] be or should it not be imposed." Defense counsel also made it clear the ultimate penalty was the jury's choice: "Can (k) outweigh (a) through (j)? If you find that it does, it does, and that is your choice. That is what we are asking you to do."

In our view, the *Brown* concerns were satisfied here. The jury was clearly informed that the word "weigh" did not connote mere counting, but rather involves a qualitative judgment. The jury was also adequately informed as to its discretion in determining whether death was the appropriate penalty. Obviously, when jurors are informed that they have discretion to assign whatever value they deem appropriate to the factors listed, they necessarily understand they have discretion to determine the appropriate penalty. The task of assigning weights to factors is not an arid exercise performed in a vacuum; it is the very means by which the jury arrives at its qualitative and normative decision as to the appropriate penalty. We recognized this in *Brown,* where we explained: "Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider, including factor 'k' as we have interpreted it. [Fn.] By directing that the jury 'shall' impose the death penalty if it finds that aggravating factors 'outweigh' mitigating, the statute should not

be understood to require any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances. *Thus the jury, by weighing the various factors, simply determines under the relevant evidence which penalty is appropriate in the particular case.*" (40 Cal.3d at p. 541, italics added.)

The dissent, however, seems to assume that the jury must go through two separate assessments in arriving at a penalty determination. This assumption is unfounded. As we explained in *Brown,* the jury makes its appropriateness determination during its normative weighing process. Then, based upon its determination of the weight of mitigating factors relative to aggravating factors, it chooses the appropriate penalty—life without possibility of parole if mitigating circumstances outweigh aggravating, or death if aggravating circumstances outweigh mitigating. This is explained in the 1986 revision of CALJIC No. 8.84.2, which states in pertinent part: "In weighing the various circumstances you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating evidence (circumstances) is (are) so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

Relying on the prosecutor's reference to the statutory "shall," the dissent concludes that this particular jury likely believed that its discretion and responsibility to assign weight to the various factors existed independently of and apart from any responsibility to determine penalty. Support for this proposition is purportedly found in the prosecutor's comments during individual, sequestered voir dire—comments directed to determining whether a prospective juror could, if the circumstances warranted it, discharge his responsibility in the penalty phase of the trial to impose the appropriate penalty.[6] The dissent thus adopts the novel view, unsupported by any cited authority, that remarks made by the prosecutor before trial to unsworn jurors during individual voir dire—which jurors have not yet been instructed on the law by the court—carry forward to create reversible error in the penalty phase of trial.

The dissent also mistakenly faults the prosecutor for urging the jurors to base their decision on the evidence presented as measured by the guidelines

---

[6] The comments, in any event, have been magnified by the dissent. Each was a result of the prosecutor's contrasting the current death penalty law with the former one that was unconstitutional for lack of standards governing the jury's exercise of discretion in sentencing. (See *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726].) He was attempting to explain that the current law does not leave jurors "rudderless," but instead provides concrete standards to guide the jury's exercise of discretion.

set forth in the court's instructions rather than by simply consulting their personal feelings. The prosecutor's exhortations did no more than urge the jurors to limit the "sentencing considerations to record evidence," a completely proper request according to the United States Supreme Court in *California* v. *Brown, supra,* 479 U.S. at page 543 [93 L.Ed.2d at p. 941]. We find no impropriety in such argument. It is a misinterpretation of the prosecutor's argument to assert, as the dissent does, that he was telling the jury it had no discretion to determine the appropriate penalty. We conclude that the jury was adequately informed that the manner in which it weighed mitigating versus aggravating circumstances was in its sole discretion and that it thereby determined whether death was appropriate.

### D. *Constitutionality of 1978 Death Penalty Law.*

Boyde contends that the 1978 death penalty law violates the Eighth Amendment's proscription of "arbitrary" sentencing procedures because it does not provide adequate safeguards to protect against arbitrary death judgments. He also argues the 1978 law is unconstitutional in various other respects. Each of his constitutional arguments has been considered and rejected in recent opinions. (See e.g., *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].)

### E. *Prosecutorial Misconduct.*

■■■ The prosecutor asserted during closing argument that the absence of a mitigating circumstance constituted aggravation. Although we stated in *People* v. *Davenport* (1985) 41 Cal.3d 247, 290 [221 Cal.Rptr. 794, 710 P.2d 861], that such argument "should not in the future be permitted," we did not rely on the point in reversing the penalty judgment. The trial in this case took place in 1982, well before our *Davenport* opinion. The argument here occurred only once at the outset when the prosecutor went through the list of aggravating and mitigating factors in light of the evidence presented. Though erroneous, we do not believe the prosecutor's argument can be deemed to have misled the jury. The trial court had instructed the jury to consider the sentencing factors only "if applicable." We generally presume that the jurors follow the court's instructions, and we are presented with no reason to believe that the jurors did not do so.

### F. *Ineffectiveness of Counsel.*

■■■ Boyde claims that his trial counsel was ineffective for failing to object to the escape evidence and the evidence in aggravation for which proper notice had not been given. His claim is unavailing since we have reviewed the matters cited on their merits and found no prejudicial error.

(See *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].)

G. *Application for Modification of Judgment.*

In every case in which a death penalty is returned, section 190.4, subdivision (e) requires the trial judge to make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law. (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 792.) The judge must "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings." (§ 190.4, subd. (e).)

Boyde contends the court's denial of the motion to modify the judgment was based on its erroneous belief that the evidence he presented at the penalty hearing did not constitute mitigation. He points to the court's statement: "There is little, if anything, that can be said in way of mitigation against imposition of the death penalty, but there are many factors in aggravation. . . ." In context, however, the court's statement was merely a reference to the weight he thought should be given the mitigating evidence. The court never indicated it thought the evidence could not be considered.

H. *Correction of Abstract of Judgment.*

Boyde contends, and the Attorney General agrees, that the abstract of judgment and minute order should be corrected to conform to the oral judgment pronounced on count II (kidnapping for robbery) of life imprisonment with possibility of parole, with sentence on that count stayed pending appeal.

## VI. DISPOSITION

The judgment is affirmed in its entirety. The abstract of judgment is ordered corrected to conform to the oral judgment pronounced as to count II (kidnapping for robbery) of life imprisonment, with execution of sentence on that count stayed pending execution of the sentence of death.

Lucas, C. J., Eagleson, J., and Kaufman, J., concurred.

ARGUELLES, J., Concurring and Dissenting.—I concur in the majority opinion insofar as it affirms the judgment of guilt and the special circumstance findings but respectfully dissent insofar as it affirms the penalty judgment. In my view, the record in this case, taken as a whole, demonstrates that the jury was misled with regard to the nature of its task and the scope of its discretion at the penalty phase of the trial. (See *People* v. *Brown* (1985) 40 Cal.3d 512, 538-544 [220 Cal.Rptr. 637, 709 P.2d 440]; *People* v. *Milner* (1988) 45 Cal.3d 227, 253-258 [246 Cal.Rptr. 713, 753 P.2d 669].) Accordingly, I would reverse the penalty judgment and remand for a new penalty trial before a properly advised jury.

In instructing the jury at the conclusion of the penalty phase, the trial court, after enumerating the various aggravating and mitigating factors contained in the 1978 death penalty law, advised the jury: "It is now your duty to determine which of the two penalties, death or confinement in the State Prison for life without possibility of parole shall be imposed on the Defendant. [¶] After having heard all of the evidence and having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] *If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the State Prison for life without the possibility of parole.*" (Italics added.) The court gave no further instructions either elaborating on the scope of the jury's discretion or explaining that, in weighing the aggravating and mitigating circumstances, the jury must make its own normative judgment of whether death or life without possibility of parole is the appropriate punishment under all the circumstances.

In *Brown, supra,* 40 Cal.3d 512, 538-544, this court recognized that the wording of the instruction which the trial court gave in this case, although tracking the language of the 1978 statute, "leave[s] room for some confusion as to the jury's role" in determining the appropriate penalty. (40 Cal.3d at p. 544, fn. 17.) In *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1277 [232 Cal.Rptr. 849, 729 P.2d 115], we explained in some detail the possible confusion that may be engendered by the wording of such an instruction.

As we explained in *Allen,* "[o]ur concern in *Brown* was that the unadorned statutory instruction might in two interrelated ways lead the jury to misapprehend its discretion and responsibility. [¶] First, we pointed out that the jury might be confused about the nature of the weighing process. As we

observed, '[T]he word "weighing" is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary "scale," or the arbitrary assignment of "weights" to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider.' [Citation.] [¶] Second, we were concerned in *Brown* that the unadorned instruction's phrase, 'the trier of fact . . . *shall* impose a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances' . . ., could mislead the jury as to the ultimate question it was called on to answer in determining which sentence to impose. Although the quoted phrase could be understood to require a juror (i) to determine whether 'the aggravating circumstances outweigh the mitigating circumstances' without regard to the juror's personal view as to the appropriate sentence, and then (ii) to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe death is the appropriate sentence under all the circumstances, we concluded in *Brown* that the statute was not intended to, and should not, be interpreted in that fashion. Instead we stated: 'By directing that the jury "shall" impose the death penalty if it finds that aggravating factors "outweigh" mitigating, the statute should not be understood to require any juror to vote for the death penalty *unless,* upon completion of the "weighing" process, *he decides that death is the appropriate penalty under all the circumstances.* Thus *the jury, by weighing the various factors,* simply *determines under the relevant evidence which penalty is appropriate in the particular case.'* [Citation.]" (42 Cal.3d at pp. 1276-1277, italics added in *Allen.*)

Because of the potential ambiguity inherent in a jury instruction which simply tracks the statutory language, *Brown* indicated that in cases tried after that decision, trial courts should give clarifying instructions, explaining to the jury the full scope of its discretion and responsibility under the 1978 law as interpreted in *Brown, supra,* 40 Cal.3d 512. With respect to cases, like the present matter, which were tried prior to *Brown,* we stated that we would examine each prior case "on its own merits to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (*Brown, supra,* 40 Cal.3d at p. 544, fn. 17.) Since *Brown,* we have undertaken such a review in numerous death penalty appeals. (See, e.g., *Allen, supra,* 42 Cal.3d 1222, at pp. 1276-1280; *People* v. *Myers* (1987) 43 Cal.3d 250, 273-276 [233 Cal.Rptr. 264, 729 P.2d 698]; *People* v. *Howard* (1988) 44 Cal.3d 375, 434-436 [243 Cal.Rptr. 842, 749 P.2d 279]; *People* v. *Hendricks* (1988) 44 Cal.3d 635, 650-651 [244 Cal.Rptr. 181, 749 P.2d 836]; *People* v.

*Melton* (1988) 44 Cal.3d 713, 761-762 [244 Cal.Rptr. 867, 750 P.2d 741]; *Milner, supra,* 45 Cal.3d 227, 253-258.)

The majority, of course, has undertaken such a review here, and has concluded that the jury was not misled in this case. (See, *ante,* pp. 252-253.) I agree with the majority that the first area of concern identified in *Brown* was not a problem in this case; in light of the entire record, particularly the closing arguments of both counsel, there is no reasonable likelihood that the jury thought that the "weighing" process was a "mechanical" procedure or did not realize that it could give different qualitative weight to each of the various aggravating and mitigating circumstances.

I cannot agree, however, with the majority's conclusion that the second concern of *Brown* was adequately satisfied. Indeed, when the entire record is considered, I think it is rather clear that the jury in this case was misled on this second, most fundamental point, i.e., on "the ultimate question [which] it was called on to answer in determining which sentence to impose." (*Allen, supra,* 42 Cal.3d 1222, 1277.)

As we have seen, in *Brown* and *Allen* we recognized that the crucial phrase in the 1978 law—"the trier of fact . . . *shall* impose a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances"—is, on its face, reasonably susceptible to varying interpretations, and "could be understood to require a juror (i) to determine whether 'the aggravating circumstances outweigh the mitigating circumstances' without regard to the juror's personal view as to the appropriate sentence, and then (ii) to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe death is the appropriate sentence under all the circumstances . . . ." (*Allen, supra,* 42 Cal.3d 1222, 1277.) As *Allen* emphasized, however, "*we concluded in Brown that the statute was not intended to, and should not, be interpreted in that fashion.*" (*Ibid.,* italics added.) Instead, we held in *Brown* that the statute "should not be understood to require any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances." (*Brown, supra,* 40 Cal.3d at p. 541.)

The record in this case reveals that from the very outset of the trial proceedings the jurors were repeatedly misinformed on this precise point. The source of the problem lay in the fact that both the prosecutor and the defense counsel misinterpreted the above-quoted phrase in the 1978 law in the very manner described in *Allen,* and proceeded on the assumption that, under the 1978 statute, each juror was not to make his or her own personal judgment of whether death was the appropriate punishment under all the

circumstances. Instead, both counsel believed that the law required the jurors simply to weigh the aggravating and mitigating factors without regard to their own assessment of the appropriate punishment and to impose the death penalty if aggravation outweighed mitigation.

The attorneys' confusion on this point is evident from several quotations from the jury voir dire which appear in the majority opinion's discussion of an entirely separate issue, the *Witherspoon* claim (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]). As the majority opinion indicates, the district attorney told one prospective juror during voir dire "that the law requires a death verdict where aggravation outweighs mitigation, 'even if you personally don't think the crime is worth it . . .'" (*ante,* p. 246), and defense counsel conveyed the same misunderstanding to the same juror, informing her that if a juror weighed the evidence and determined that aggravation outweighed mitigation "'the law mandates that you come in with a finding of death', no matter what your personal feelings may be.'" (*Ibid.*)

As a review of the entire voir dire reveals, the passages quoted in the majority opinion are by no means isolated or atypical statements.[1] Throughout the lengthy voir dire process, counsel repeatedly informed potential jurors of this erroneous view of the jury's task at the penalty phase, and repeatedly sought assurance from potential jurors that they would adhere to this understanding of their role and would resolve the question of penalty solely on the basis of whether aggravation outweighed mitigation or mitigation outweighed aggravation, without regard to the juror's own personal view of whether death or life without possibility of parole was the appropriate punishment under all the circumstances.[2]

---

[1] At one point, the majority appears to imply that it may be improper to look to discussions between counsel and potential jurors during voir dire in determining whether or not the jurors properly understood the scope of their sentencing discretion under the 1978 law as interpreted in *Brown*. (*Ante,* pp. 254-255.) In *People* v. *Allen, supra,* 42 Cal.3d 1222, 1279-1280, however, this court—in evaluating a *Brown* claim similar to that at issue here—relied on a prosecutor's voir dire exchanges with potential jurors in finding that several comments made by the prosecutor during the penalty phase closing argument were not likely to have misled the jurors as to the scope of their sentencing discretion. If voir dire exchanges may be referred to in order to "cure" potential *Brown* error as they were in *Allen,* it is difficult to see a principled basis for refusing to consider such voir dire exchanges when they exacerbate, rather than alleviate, the potentially misleading impact of closing argument.

[2] Excerpts from the voir dire of several jurors who were chosen to sit on the jury illustrate the point.

"Q. [District Attorney] . . . Now, the way the law is now, you are going to be given certain aggravating and mitigating factors. That's what they are called, aggravating and mitigating.

"A. Right.

"Q. And it will be your job to evaluate the evidence presented not only at trial, but at the penalty portion, if we get there, and you will weigh the evidence and decide whether or not the aggravating circumstances outweigh the mitigating.

Furthermore, the prosecutor repeatedly suggested to potential jurors that one of the virtues of such a sentencing procedure was that it relieved a juror

---

"A. Right.

"Q. If the law directs you to a verdict of death, even though given your druthers and your idea of what the crime is worth, disagreeing with that, you still obligated to follow the law even if the consequence is ultimately death.

"A. I understand that, also. I understand that the decision isn't based on where I think it is appropriate.

"Q. Right.

"A. No. I understand that.

"Q. It is essentially going to be a legal decision based upon rules given to you.

"A. Right.

"Q. Any problem with that format?

"A. I personally don't even know when it is appropriate and when the law says it is. I don't know that. So, those cases where I feel that it is appropriate, just my own personal—my own personal feelings. So that doesn't enter into it.

"Q. I think I come from about the same place that you do, in that I would feel uncomfortable if I didn't have any guidelines.

"A. Uh-huh.

"Q. And I feel much better that I am told this is what is expected of me, and I think what you are telling me is you are willing to enter into that wholeheartedly, and you don't have any reservations—

"A. No, I don't.

"Q.—about applying the law?

"A. About applying the law, no, I don't."

"Q. [District Attorney] There will be a list of, I think, nine or ten factors that you will have to guide you as you approach the evidence and you will be told that if you find the factors in aggravation outweigh those in mitigation, that you shall return a verdict of death. Doesn't say you may, doesn't say it is one of your choices, it says you shall return a verdict of death. [¶] Any problem with that?

"A. No.

"Q. What if you are faced with a situation, though, where you personally, if you had to write on a blank slate, would not make this crime a death penalty crime, yet as you go through the factors it is clear to you that the law requires that verdict. [¶] Can you put your own thoughts aside and follow the law?

"A. Yes, I could.

"Q. Even on a question like this, which is possibly life or death?

"A. Yes, I could put it aside."

"Q. [District Attorney] So, what they have done is created a lot of things to look at, about nine or ten factors. And essentially what you do is you take that evidence and plug it into the factors, and if you find that the ones that make the crime worse, those that aggravate it, outweigh the others you shall return a death penalty. If you find, on the other hand, that the factors in mitigation, make it less serious, outweigh it, you shall return a verdict of life without parole. [¶] Essentially, you are making a legal decision, you are trying to apply the law of the State of California, trying to do essentially the will of the people in deciding what is the appropriate penalty, what they have said to be the appropriate penalty in this case. So, it is not so much you, personally, it is what you think the law requires.

"A. Uh-huh.

"Q. I think it is a better way, I would be much more satisfied sitting as a juror in that situation, I trust you would, too. [¶] But, what it may mean is it may mean that you personally if you had to do all over again, would not write the law that way. It might mean, 'Well, I don't think this crime deserves the death penalty,' yet as you look at what the factors are, you may

of the responsibility of deciding "whether I personally think [the defendant] should die or not die" and contributed to the juror's "peace of mind" by enabling him to view his role as simply applying the law "as it has been passed."[3] In light of the awesome nature of the responsibility of personally determining whether death is the appropriate punishment for another individual, it is not surprising that the jurors readily agreed that they would prefer not to have to make that kind of personal moral judgment. (Cf. *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 332-333 [86 L.Ed.2d 231, 241-242, 105 S.Ct. 2633].)

After inculcating the jurors during voir dire on this erroneous view of their sentencing role, the prosecutor reiterated this misunderstanding of the applicable principles in closing argument at the penalty phase.

At the beginning of his penalty phase argument, the prosecutor read the language of the pre-*Brown* instruction that the trial court subsequently gave the jury and explained to the jury: " . . . the test is whether aggravating outweighs mitigating or mitigating outweighs aggravating. There is no requirement that I have to prove the aggravating outweighs beyond a reasonable doubt, beyond clear and convincing evidence. The test is whether, when you weigh the two, do the aggravating factors outweigh the mitigating factors or vice versa. [¶] *If you find that the aggravating factors outweigh,*

be required to return a penalty of death. [¶] Can you put aside what you personally feel and follow the law even in that situation?

"A. I think I could."

[3] "Q. [District Attorney] . . . The situation becomes most difficult, I think, when you are dealing about a question of life and death. The question as to whether or not the Defendant should get the death penalty or should not get the death penalty. Because the way the law is set up now, it is a very strict structure, there are a list of about nine or ten factors that you are to look at in deciding whether the death penalty should be imposed or whether life without possibility of parole should be imposed. [¶] And, I believe it is quite possible that you, personally, if you were writing on a blank slate or writing the law yourself would, in a particular case, not think the death penalty was appropriate, but yet the law says it is.

"A. Uh-huh.

"Q. Will you be able to go along with the law?

"A. Yes.

"Q. Okay, this is a rule of law, not of people; and, if you substitute your personal ideas for the law, you are frustrating the will of society which you are a member of.

"A. Right.

"Q. Any problem with that idea?

"A. No.

"Q. I think it also, I don't know, but if I was sitting on a jury such as this, for me to recognize that what I am essentially doing is apply the law as it has been passed and I am not personally deciding whether or not I like the Defendant, don't like the Defendant, whether I personally think he should die or not die. I find it far easier or I find it, at least for my peace of mind, a better way to do it, then in fact what I am doing is applying the law.

"A. Yes, that is the same thing I was thinking, just kind of remove yourself from—

"Q. That's right . . . . ."

*and it can be a slight outweigh, it will be your obligation to return a verdict of death.*" (Italics added.)

Then, after discussing each of the individual factors at some length,[4] the prosecutor returned to the question of what the law *required* of the jury. He stated: "We went through an extensive voir dire process in this case, and you were asked specifically, I think by myself, and I think I asked each and everyone of you, can you personally go along with this, personally commit yourself to the idea that even though you may have to make a difficult and emotionally touchy decision, can you do it, a personal commitment to what the law is going to require of you . . . . [¶] The important thing is this personal commitment that you have here to be willing to follow the law and to put aside what you would like to do for your own, you know, your own feeling of feeling good about it. [¶] Well, I am asking you now to follow the law as it is given to you by the Court and apply it to the evidence as presented . . . . [¶] But, don't try to avoid the tough decision by sitting and trying to rationalize or trying to seek a way out of a tough decision, you are going to have to face it head on, you are going to have to go through each and every one of those factors and decide it. *Is this the case, is this the kind of case as I am guided by these factors that warrants the death penalty?*" (Italics added.)

Although the majority opinion interprets the last quoted sentence as indicating that the prosecutor was telling the jurors to personally decide for themselves whether or not they felt that death was warranted (i.e., "appropriate"), when viewed in the context of the entire record I do not believe that that is how that sentence would have been understood by the jury. As we have seen, the prosecutor had carefully instructed the jurors during voir dire that it was "the law"—rather than the jury's personal judgment—which determines whether the death penalty is "warranted," and that the law mandates that death be imposed if aggravation outweighs mitigation. In this setting, I do not think that the emphasized sentence would have been viewed by the jury as contradicting all the prosecutor had previously ar-

---

[4] As the majority opinion acknowledges (*ante,* p. 255), in discussing the statutory factors the prosecutor erroneously told the jury that the absence of a mitigating factor constituted an aggravating factor. (See *People* v. *Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861].) Thus, after completing his review of all of the factors up to factor (k), he told the jury: "it seems to me that before you even get to the last factor . . . you've got ten solid factors in aggravation, ten solid factors."

Although the impact of this type of so-called "*Davenport*" error (*supra,* 41 Cal.3d 247) may be reduced when it is clear that the jury realizes that its task is not simply to determine whether aggravation outweighs mitigation in an "objective" abstract sense but rather to determine whether, under all the circumstances, death or life without parole is the appropriate punishment, as discussed above there is very good reason in this case to fear that the jury did not properly understand this very point. Thus, in this case, the combination of the *Brown* and *Davenport* errors resulted in an increased prejudicial effect.

gued, but rather would have been understood simply as a reiteration of the prosecutor's theme.

Indeed, the prosecutor returned to that theme once again in his rebuttal closing argument. He stated: "The next thing is, you have to understand this is not a personal decision, it is not a situation where we toss the case to you and say, 'Hey, how do you feel today, do you want to impose the death penalty or not.' I don't know about you, but it is not something that I would like to do on a day-to-day basis, make that kind of decision. [¶] What we said to you is here is the rule of law, here is the evidence, please apply the evidence to the rules of law and make a decision based upon what the law requires of you, same process that you went through in deciding guilt. [¶] *You are deciding the just punishment according to law. You're not deciding* whether I like him, don't like him, *whether it's my decision to impose the death penalty.* [¶] You have been given very clear guidelines, eleven of them, to direct your decision in this case. You have taken an oath that you would be willing to do that, and that's what you have to do." (Italics added.)

Then, at the end of his argument, the prosecutor advised the jury: "I would suggest, as you go through this evidence and you go through each factor, that you go through them one by one and decide whether that factor aggravates or that factor mitigates. [¶] If you find at the very end that every factor that you've heard aggravates this crime, the penalty is, obviously, apparent, it is clearly the death penalty. But, let's say you find one factor mitigates and the other factors all aggravate. It is not a process of counting, it's not 10 to 1, it is a process of weighing. And, you should decide whether or not that one factor in mitigation outweighs all those factors in aggravation and then decide the case. [¶] And the instruction is specific on this and I don't know if Defense Counsel is inviting you not to do this, that he is inviting you to make a decision independent of what the instruction is;[5] but, this is what your obligation is, if you conclude the aggravating circumstances outweigh the mitigating circumstances, you shall impose the sentence of death."

---

[5]At this point, the prosecutor was apparently referring to the brief comment in defense counsel's closing argument that is quoted by the majority: "Can (k) outweigh (a) through (j)? If you find that it does, it does, and that is your choice. That is what we are asking you to do." Although this remark may have suggested to the jury that it had the *power* to find that mitigation outweighed aggravation and thus to decline to impose the death penalty, defense counsel never argued that the statutory "aggravation outweighs mitigation" formulation was intended to require each juror to make his or her own normative judgment as to whether death was the appropriate punishment, and thus the quoted comment of defense counsel was vulnerable to the prosecutor's argument that counsel was inviting the jury to make a decision "independent of" the court's instruction. This is particularly so since, during voir dire, defense counsel never took issue with the prosecutor's repeated assertion that the law required the imposition of the death penalty if aggravation outweighed mitigation, without regard to the jurors' personal views as to appropriateness of the penalty under all the circumstances.

Viewing the record as a whole, I believe the jury in this case was clearly misled as to the scope of its discretion and the nature of its role in determining sentence. During voir dire, the potential jurors were repeatedly told that their task at the penalty phase was not to make a personal determination as to whether they thought death or life without parole was the appropriate punishment, but rather simply to determine whether the designated aggravating factors outweighed the mitigating factors. That misunderstanding of the jury's function was not corrected by the trial court's penalty phase instruction nor by closing argument of counsel.

Contrary to the majority's suggestion, my conclusion that the jury was misled in this case does not rest on any "assum[ption] that the jury must go through two separate assessments in arriving at a penalty determination." (*Ante,* p. 254.) If the jury properly understands that the weighing process is the means by which each juror determines whether he or she personally believes that death or that life imprisonment without possibility of parole is the appropriate punishment for the defendant in light of all the aggravating and mitigating factors, I have no doubt that jurors are quite capable of making an "appropriateness determination" in the course of the weighing process itself. But the jurors in this case were never instructed that the weighing process was a means for them to make such a personal appropriateness determination. Instead, they were affirmatively misinformed that it was *not* their responsibility to decide whether or not they personally believed that death was the appropriate punishment, and were told that, under the law, they were only to decide whether aggravation outweighed mitigation without regard to their personal view as to the appropriate penalty.

Although the majority purports to find support for its determination that the jury was not misled in the language of the 1986 revision of CALJIC No. 8.84.2 (see *ante,* p. 254)—an instruction that was not given to this jury—in fact that revised instruction contains a crucial passage which provides jurors with an entirely different message than the one which the prosecutor conveyed to the jurors in this case. The revised instruction specifically informs the jury that "[*t*]*o return a judgment of death, each of you must be persuaded that the aggravating evidence (circumstances) is (are) so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.*" (Italics added.) As we have seen, the prosecutor in this case never suggested to the jurors that they had to determine whether the aggravating evidence in comparison with the mitigating evidence was "so substantial . . . that it warrants death instead of life without parole," but on the contrary argued that if the jurors found that the aggravating factors even slightly outweighed the mitigating factors the jurors were obligated to return a verdict of death and that it was not each juror's

responsibility to determine "whether it's my decision to impose the death penalty."[6]

Under these circumstances, I conclude that the penalty judgment should be reversed and the case remanded for a new penalty trial before a jury that is properly informed as to its responsibility and discretion in determining the appropriate penalty. (See *Milner, supra,* 45 Cal.3d 227, 256-268.)

Mosk, J., and Broussard, J., concurred.

Appellant's petition for a rehearing was denied November 9, 1988. Mosk, J., Broussard, J., and Arguelles, J., were of the opinion that the petition should be granted.

---

[6] Indeed, although the majority finds no *Brown* error in this case, the Attorney General has never argued that the jury was accurately informed of its proper penalty phase role under *Brown, supra,* 40 Cal.3d 512. In the only post-*Brown* brief filed by the Attorney General, the Attorney General simply argues that *Brown* was wrongly decided and should be overruled. We have, of course, recently reaffirmed the *Brown* decision. (See, e.g., *Milner, supra,* 45 Cal.3d 227, 253-258; see also *People* v. *Guzman* (1988) 45 Cal.3d 915, 958-959 [248 Cal.Rptr. 467, 755 P.2d 917].)