Filed 2/21/14  P. v. Gueye CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B245437 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA396964) |
| v. | |
| OGO GUEYE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Clifford L. Klein, Judge.  Affirmed with directions.

Juliana Drous, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Shawn McGahey Webb, Deputy Attorneys General, for Plaintiff and Respondent.

# I.  INTRODUCTION

A jury convicted defendant, Ogo Gueye, of first degree burglary (Pen. Code, § 459)[1] and two counts of second degree robbery (§ 211).  Defendant was sentenced to six years in state prison.  We affirm the judgment but we direct the trial court, upon remittitur issuance, to amend the abstract of judgment.

# II.  THE EVIDENCE

Two victims, Christopher McLean and Quinlin Messenger, encountered defendant burglarizing their apartment.  Mr. McLean got a good look at defendant's face.  Defendant was wearing:  a white T-shirt; white or light-colored pants; a belt; gold chains; and a large "very flashy" gold watch.  He spoke with a thick Jamaican or African accent.  Defendant fled.  Mr. McLean and Mr. Messenger chased defendant.  They repeatedly caught up to him.  Defendant said he had a gun.  Defendant also threatened to stab Mr. McLean and Mr. Messenger.  Eventually, defendant escaped.

At the scene of the chase, police officers found a jacket.  The jacket contained property belonging to defendant.  Based on Mr. Messenger's description of the perpetrator, police officers detained defendant.  Defendant was wearing:  two pairs of sweatpants—gray and blue; a large gold watch; a white metal chain with an "E" on it; and "bedazzled" black shoes.  The officers recovered clothing they had seen defendant discard:  "True Religion" pants; a black watch; a belt; and a black head covering.  Mr. Messenger identified defendant.  At trial, both victims identified defendant as the perpetrator.

Defendant testified in his own defense.  Defendant said he was from Senegal and English was his third language.  Defendant denied committing the burglary.  Rather, according to defendant, the burglary and robberies were committed by a person named

---

[1]  All further statutory references are to the Penal Code unless otherwise noted.

"Buzz." The person identified only as Buzz was an acquaintance of defendant. Extraordinarily, the person identified only as Buzz looked and sounded like defendant. And, to complicate matters, defendant only knew the apparent burglar and robber by the name Buzz. Defendant did not know Buzz by any other name.

On the night of the burglary, defendant and Buzz planned to go to a club for Reggae night. Club patrons wore black and white clothing for Reggae night. Defendant lent Buzz: a white T-shirt; white "True Religion" jeans; a Louis Vuitton belt; and a pair of gray sweatpants. Defendant wore: black jeans; piano key suspenders; a white T-shirt; a black jacket; black rhinestone-encrusted shoes; a white metal chain with an "E" emblem; an earring; and a bracelet. Defendant wore blue sweatpants under his jeans. When they later met to attend the club, Buzz wore: the white "True Religion" jeans; a white T-shirt; the Louis Vuitton belt, white sneakers; an earring; a gold chain; and a gold watch. He put the sweatpants he had been wearing into a backpack. During the evening, defendant left the club without his jacket. Buzz later left the club with defendant's jacket. But Buzz did not return the jacket to defendant.

Defendant went to a hotel with a woman he had met at the club. When he left the hotel, he was wearing: his blue sweatpants; piano-key suspenders; white T-shirt; black jeweled shoes; and his jewelry. Defendant testified he left his jeans in the hotel. Defendant met up with Buzz at a bus depot. An altercation followed during which defendant knocked Buzz to the ground. Buzz may have been unconscious. Defendant removed all of Buzz's clothing and jewelry—the white jeans, T-shirt and the gold and black watches. Defendant also took his sweatpants. They were in Buzz's backpack. According to defendant, a homeless man saw what was happening. The homeless man accused defendant of robbery and threatened to call the police. In response, defendant put the gray sweatpants on over his blue ones. He carried the white jeans and the black watch. Defendant testified he was thereafter detained by law enforcement officers. Mr. Messenger's watch was being worn by defendant. As noted, this ironically occurred when defendant took the clothing from Buzz's backpack.

3

Chris Campbell corroborated defendant's presence at the club on the night of the burglary. Mr. Campbell saw defendant. At that time, defendant was wearing: black pants; a white shirt; a black jacket; and rhinestone-studded black shoes. Mr. Campbell later heard defendant and another man speaking with a woman. Both defendant and the other man, another black male, had foreign accents—Jamaican or African. Defendant was not wearing his jacket at that time. The other man was wearing white pants, a white shirt, white shoes, and a Louis Vuitton belt.

Dr. Robert Shomer testified about eyewitness identifications. Dr. Shomer discussed factors affecting the reliability of such identifications. In rebuttal, the People presented evidence Mr. Campbell and defendant had both been booked at the Hollywood police station on the same day. Arrestees were held in one of two cells. Both defendant and Mr. Campbell were subsequently transferred to the county jail.

III. DISCUSSION

A. Asserted Sixth Amendment Violation

1. Overview

Defendant argues the prosecution deliberately intruded into his attorney-client relationship in violation of his Sixth Amendment rights. The claim arises from the seizure of defendant's preliminary hearing transcript and notes from his jail cell near the trial's end. Defendant contends his conviction must therefore be reversed. We find no realistic possibility of prejudice to defendant or benefit to the prosecution, hence no reversible error.

2. Pertinent factual background

The pertinent facts are as follows. Deputy District Attorney Louis Avila presented the prosecution's case beginning on Monday, October 15, 2012. The prosecution rested

4

on Tuesday, October 16, 2012. Defendant testified in his own defense. On Wednesday, October 17, 2012, prior to testifying, defendant handed his attorney, Deputy Public Defender Natasha Brown, a folder of notes. Defendant had made these notes concerning the events preceding his arrest. Ms. Brown reviewed the notes and handed the folder back to defendant. The folder also contained a copy of the preliminary hearing transcript. There is no evidence Mr. Avila or any other person knew the documents had been shown to Ms. Brown when they were seized. Direct examination commenced Wednesday morning, October 17, 2012, and continued into the afternoon. Mr. Avila's cross-examination of defendant began at about 3 p.m. and continued to the end of the day.

Also on October 17, 2012, Mr. Avila requested defendant's jail cell be searched. Mr. Avila set forth his reasons for doing so in a declaration filed in the trial court: "[M]y purpose for making the request was my suspicion that Defendant Gueye, who had been on the stand for most of the day on 17 October, on both direct and cross-examination, was fabricating a story to account for [facts pointing to him as the perpetrator]. [¶] . . . My suspicion was further raised by the identification, for the first time, in the middle of trial that there was an in-custody witness[, Mr. Campbell,] who could corroborate the Defendant's story. [¶] . . . That based on these suspicions, I believed that the Defendant was communicating with this 'surprise' in-custody witness details which would support his lies." Mr. Avila also described what he hoped to find in defendant's jail cell: "That based on these suspicions I requested that Defendant's cell be searched in order to determine if there were any contact phone numbers which could be associated with this surprise witness (who was identified in-court only when he was due to enter a time-served plea on a narcotics case in the building, but in a different court room). [¶] . . . That I further requested documents which would support my suspicion that the Defendant was concocting his elaborate lie deliberately."

The following morning, Thursday, October 18, 2012, Mr. Avila advised the court that defendant's jail cell had been searched and the documents found. Mr. Avila described the documents: "There were a number of documents that appear to be - - well, the transcript of the preliminary hearing. There are some [handwritten] notes made on

5

the back and in the front of a motion from defense." Mr. Avila acknowledged the notes contained no mention of defendant's last-minute witness, Mr. Campbell. Mr. Avila argued: "It's for impeachment, your Honor, and for intent. [¶] I am seeking to admit the preliminary hearing transcript to show that it was available to him coincident with the notes that he has, which are very detailed with regard to his statement." Mr. Avila described the notes: "There are several pages of notes. In one, there is some columns which talk about the details of his testimony, essentially. He lays out in a grid - -"

The trial court denied Mr. Avila's request to admit the preliminary hearing transcript. Mr. Avila wanted to show defendant possessed the preliminary hearing transcript when the notes at issue were prepared. The trial court denied that request stating it did not want the jury reading the entire preliminary hearing transcript. The trial court asked Mr. Avila to identify any substantial variance between the facts as set forth in defendant's notes and trial testimony. The trial court found there was no substantial inconsistency warranting introduction for impeachment purposes. Moreover, particularly in view of the belated discovery of the notes, the trial court was disinclined to allow impeachment on insubstantial inconsistencies. The trial court formally ruled no evidence based on the documents found in defendant's jail cell would be allowed.

Mr. Avila resumed cross-examining defendant. Mr. Avila's cross-examination and Ms. Brown's redirect examination were completed prior to the noon recess. Mr. Avila made no attempt to impeach defendant with any statements made or facts set forth in the documents recovered in the jail cell search.

On Monday, October 22, 2012, four days after she was apprised of the seizure of the papers, Ms. Brown made a verbal motion to dismiss. She argued: "Mr. Avila ordered that my client's cell be searched . . . the night of the morning where he was . . . still on the stand on cross-examination, and that search did not appear to serve any legitimate purpose. It was ordered by Mr. Avila and conducted by the sheriffs, and it resulted in the obtaining by the government of privileged information, in violation of my client's rights under the Fourth and Sixth Amendment[s]. The documents that were recovered all fall within the attorney-client privilege category. They were notes on the back of motions

6

that I had given him, notes regarding his testimony, notes regarding his case, notes that were intended for me. [¶] The government has obtained and read these privileged documents. That means there was a deliberate piercing of the attorney-client privilege and, based on that, I am making a motion to dismiss." The trial court advised the parties to prepare a formal motion.

The jury reached its verdicts on October 23, 2012. On November 19, 2012, defendant filed a motion to dismiss or for a new trial. In support of the motion, Ms. Brown declared: "[O]n October 17th, while in the courtroom lockup, [defendant] handed me a folder of notes he took regarding his testimony in this matter so that I may review them. I did review these notes and handed them back to [defendant]. [¶] . . . [O]n the morning of October 18th I was handed a folder by Deputy District Attorney Lou Avila containing copies of these same notes. Mr. Avila advised me that the notes had been recovered when [defendant's] cell had been searched the night before. [¶] . . . Mr. Avila reviewed these notes in my presence." Defendant argued: the notes in question were attorney-client privileged; the prosecution's violation of the attorney-client privilege warranted dismissal or a new trial; the prosecution had not shown an absence of prejudice to defendant; and defendant's Fourth, Fifth and Sixth Amendment rights had been violated. Defendant presented no evidence Mr. Avila had any knowledge the notes seized from the jail cell had previously been shown to Ms. Brown.

In his opposition, Mr. Avila argued there had been no misconduct and no prejudice to defendant. Mr. Avila declared, "I requested to use the documents [found in defendant's jail cell] to impeach the defendant's testimony and . . . this request was denied." Mr. Avila further declared, "[A]t no time did I form any question or elicit any answer which pertained to any information contained [i]n the recovered documents."

The trial court denied defendant's motion to dismiss or for a new trial. The trial court credited Mr. Avila's statement as to the nonuse of defendant's notes. A November 21, 2012 minute order states, "The court finds that the documents seized were privileged, but the People didn't use the documents in the trial, the court found that th[ere] was no prejudice, and the violation occurred late in the trial."

### 3. Analysis

On appeal, defendant asserts a violation of his federal Sixth Amendment right to counsel. A criminal defendant's fundamental right to counsel is guaranteed by the Sixth Amendment to the United States Constitution. (*Gideon v. Wainwright* (1963) 372 U.S. 335, 339-345; *People v. Alexander* (2010) 49 Cal.4th 846, 887; *Barber v. Municipal Court* (1979) 24 Cal.3d 742, 750.) This right includes the right to effective assistance of counsel in the preparation and trial of the defense case. (*Powell v. Alabama* (1932) 287 U.S. 45, 71; *Barber v. Municipal Court, supra,* 24 Cal.3d at p. 750; *People v. Douglas* (1964) 61 Cal.2d 430, 434.) A defense attorney must carefully investigate all potential defenses of fact or law. (*Barber v. Municipal Court, supra,* 24 Cal.3d at p. 751; *People v. Ibarra* (1963) 60 Cal.2d 460, 464, disapproved on another point in *People v. Pope* (1979) 23 Cal.3d 412, 425.) To that end, the accused must be assured of the confidentiality and privacy of his or her communications with counsel including as to facts concerning the charged acts. (*Barber v. Municipal Court, supra,* 24 Cal.3d at p. 751; *In re Jordan* (1972) 7 Cal.3d 930, 941.) No federal Constitutional provision including the Sixth Amendment specifically establishes an attorney-client communication privilege. (*Howell v. Trammell* (10th Cir. 2013) 728 F.3d 1202, 1222; *People v. Alexander, supra,* 49 Cal.4th at pp. 887-888.) But, as our Supreme Court has held, the right to confidential communication between a defendant and his or her attorney is "an aspect" of the right to assistance of counsel. (*People v. Alexander, supra,* 49 Cal.4th at p. 888.) Ordinarily, we review the trial court's denial of a dismissal or new trial motion for an abuse of discretion. (*People v. Thompson* (2010) 49 Cal.4th 79, 140; *People v. Guerra* (2006) 37 Cal.4th 1067, 1159, disapproved on another point in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) However, where substantial evidence supports the trial court's factual findings, we review de novo the trial court's denial of defendant's dismissal or new trial motion on Sixth Amendment grounds. (See *People v. Alexander, supra,* 49 Cal.4th at pp. 887, 889; *People v. Zapien* (1993) 4 Cal.4th 929, 966-968.)

Defendant argues: "[The burden] is on the prosecutor to prove non-use of [the intercepted] information. He has not done so." Defendant concedes, "[N]one of the documents were admitted against [defendant] at his trial, and no questions directly asked regarding the contents in the materials[.] Defendant argues there was prejudice, however, because, "[I]t has not been shown that the prosecutor did not use the documents to prepare his cross-examination of [defendant] or his closing arguments." Defendant concludes: "In the instant case, the prosecutor purposefully intruded into [defendant's] attorney privilege, impermissibly obtaining information about [defendant's] trial strategy in order to prepare his cross-examination of [defendant]. . . . [I]t is virtually impossible to sort out how the information was 'consciously or subconsciously factored into' the prosecutor['s] preparation of his cross-examination of [defendant]."

We assume that, as the trial court found, the documents in question were privileged. The documents were shown to and reviewed by Ms. Brown. (See Evid. Code, § 952; *People v. Alexander, supra,* 49 Cal.4th at p. 887.) Our Supreme Court has not decided who bears the burden of proving or disproving injury to the defendant or benefit to the state upon a violation of the Constitutional right to counsel. (*People v. Alexander, supra,* 49 Cal.4th at p. 889, fn. 23; *People v. Ervine* (2009) 47 Cal.4th 745, 768, fn. 11.) The Ninth Circuit has held that once a prima facie case of government intrusion has been established, the prosecutor bears the burden of proving no prejudice to the defendant. (*U.S. v. Danielson* (9th Cir. 2003) 325 F.3d 1054, 1059, 1071; see *People v. Alexander, supra,* 49 Cal.4th at p. 889, fn. 23.) We presume for the purposes of discussion the Ninth Circuit analysis correctly allocates the burden on the prosecution to prove no harm resulted from the notes' discovery.

There is no per se rule requiring reversal of a conviction when the prosecution acquires knowledge of defense strategy. (*Weatherford v. Bursey* (1977) 429 U.S. 545, 549; *People v. Alexander, supra,* 49 Cal.4th at p. 888.) Moreover, where there is no realistic possibility of injury to the defendant or prosecutorial benefit, there is no violation of the Sixth Amendment right to counsel. (*Weatherford v. Bursey, supra,* 429 U.S. at pp. 558-559; *People v. Alexander, supra,* 49 Cal.4th at pp. 888-889; *People v.*

9

*Ervine, supra,* 47 Cal.4th at p. 764; see *U.S. v. Danielson, supra,* 325 F.3d at p. 1069.) We turn to the facts of the present case to determine whether there was any realistic possibility of injury to defendant or benefit to the prosecution.

Substantial evidence supported the trial court's finding the prosecution did not benefit from the seizure of defendant's notes and the preliminary hearing transcript. (See Evid. Code, § 952; *People v. Alexander, supra,* 49 Cal.4th at p. 887.) Mr. Avila declared he did not use the notes. In addition, defendant's own testimony was consistent with the facts set forth in his notes. Further, Mr. Avila did not gain access to defendant's notes until late in the trial. This occurred when Mr. Avila's cross-examination of defendant was nearing completion. Moreover, both defendant and his trial counsel, Ms. Brown, knew the contents of his notes. But, defendant has not identified any specific evidence offered by the prosecution or argument made to the jury that he contends arose from the intercepted notes. (*People v. Alexander, supra,* 49 Cal.4th at p. 889; see *Weatherford v. Bursey, supra,* 429 U.S. at pp. 547-549.) Nor is there any evidence Mr. Avila's knowledge of defendant's notes hindered the attorney-client relationship. Ms. Brown's succinct declaration never states the prosecutor's discovery of the notes interfered with her ability to provide a defense. (Compare, e.g., *Barber v. Municipal Court, supra,* 24 Cal.3d at p. 756; 5 Witkin & Epstein Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 276, pp. 460-461.) We have read the notes taken from defendant's jail cell, as well as the entire record on appeal. We find no basis for concluding there was a reasonable possibility of prejudice to defendant or prosecutorial benefit.

## B.  Failure To Instruct

Mr. Campbell, a key defense witness, appeared at trial in handcuffs. Defendant argues it was reversible error to not *sua sponte* instruct the jury that Mr. Campbell's being in physical restraints should have no bearing on the guilt determination. Defendant contends, "[The instructional error] violated [defendant's] Sixth Amendment rights to a fair trial and to present a defense, [therefore] the judgment must be reversed unless it is

shown that the error was harmless beyond a reasonable doubt." Defendant notes Mr. Campbell was a crucial witness. In addition, during closing arguments, Mr. Avila repeatedly referred to the fact that Mr. Campbell was in custody. Further, reference was made to Mr. Campbell's multiple felony convictions. Finally, Mr. Avila noted Mr. Campbell appeared in handcuffs. Defendant's counsel, Ms. Brown, did not object to those comments.

As noted above, Mr. Campbell corroborated defendant's testimony in part. Mr. Campbell was in custody at the time he testified. He appeared in jail attire and in handcuffs. When Mr. Campbell's availability as a witness was first raised, the trial court commented: "[H]e doesn't get civilian clothes. He is going to come in the way he is." Defense counsel, Ms. Brown, responded, "I understand." Following Mr. Campbell's testimony, Mr. Avila requested instruction with CALCRIM No. 337 because Mr. Campbell was "physically restrained." Ms. Brown agreed. The discussion that followed was this: "Ms. Brown: Yeah, I'm also asking for 337. [¶] The Court: 337? [¶] Ms. Brown: Yeah. Witness restrained. [¶] The Court: Let me take a look at it. . . . . [¶] . . . [¶] The Court: Which one? A or B? [¶] Ms. Brown: B. [¶] The Court: Okay. Yeah, it would be 337(B). Okay." The jury was instructed pursuant to alternative B.[2]

CALCRIM No. 337, alternative A states: "When _____ testified, [he was] physically restrained. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discus it during your deliberations. Evaluate the witness's testimony according to the instructions I have given you." (Brackets omitted.) CALCRIM No. 337, alternative B provides: "When _____ testified, [he was] in custody. Do not speculate about the reason. The fact that a witness is in custody does not by itself make a witness more or

---

[2] The jury was instructed: "When Chris Campbell testified, he was in custody. Don't speculate about the reason. The fact that a witness is in custody does not by itself make a witness more or less believable. Evaluate the witness's testimony according to the instructions I have given you."

11

less believable.  Evaluate the witness's testimony according to the instructions I have given you."  (Brackets omitted.)

The Attorney General concedes that it was error to not *sua sponte* instruct the jury with CALCRIM No. 337, alternative A, as required by *People v. Duran* (1976) 16 Cal.3d 282, 288, footnote 4, and 291-292.  (See *People v. Lopez* (2013) 56 Cal.4th 1028, 1080.)  The Attorney General contends, however, that defense counsel invited the error by requesting instruction with CALCRIM No. 337, *alternative B*.  We disagree with the Attorney General.  Our Supreme Court has held, "The doctrine of invited error bars a defendant from challenging a jury instruction given by the trial court when the defendant has requested the instruction based on a """""conscious and deliberate tactical choice.""""""  (*People v. Harris* (2008) 43 Cal.4th 1269, 1293; accord, *People v. DeHoyos* (2013) 57 Cal.4th 79, 138.)  On the record before us, it cannot be said that Ms. Brown acted deliberately and expressed a clear preference for alternative B over alternative A.  It appears instead that both the trial court and defense counsel erred in selecting alternative B.  In the discussion about CALCRIM No. 337, both Mr. Avila and Ms. Brown specifically referred to the fact that Mr. Campbell was physically restrained. Alternative A, not alternative B, references a witness who was physically restrained.  Therefore, we do not conclude Ms. Brown invited the error.

We review the instructional error for prejudice.  (*People v. Wilson* (2008) 43 Cal.4th 1, 19-20; *People v. Carpenter* (1997) 15 Cal.4th 312, 393.)  We consider whether it is reasonably probable the jury would have reached verdicts more favorable to defendant had it been instructed with CALCRIM No. 337, alternative A.  (*Ibid.*; see Cal. Const., art. VI, § 13.)  The jury was aware that Mr. Campbell was in custody when he testified.  The jury was instructed that fact did not make Mr. Campbell more or less believable.  The jury was told to evaluate Mr. Campbell's testimony as it would any other witness.  The failure to additionally instruct the jury to disregard the fact Mr. Campbell was in handcuffs was not prejudicial.  The physical restraint was but a manifestation of Mr. Campbell's being in custody, a fact known to the jury and as to which it was properly instructed.  It is not reasonably probable the jury's verdicts would have been more

12

favorable to defendant had the jury been instructed with CALCRIM No. 337, alternative A.

### C.  Abstract Of Judgment

The parties agree that the abstract of judgment must be amended to reflect the actual sentence imposed.  (*People v. Jones* (2012) 54 Cal.4th 1, 88; *People v. Boyde* (1988) 46 Cal.3d 212, 256.)  The abstract of judgment must be amended to show: concurrent sentences on counts 1 and 2 rather than section 654, subdivision (a) stays; $120 in court operations assessments (§ 1465.8, subd. (a)(1)); $90 in court facilities assessments (Gov. Code, § 70373, subd. (a)(1)); and penalties and assessments on the $10 local crime prevention programs fine (§ 1202.5, subd. (a)) in addition to the $2 state surcharge (§ 1465.7, subd. (a)).  The additional penalties and assessments on the local crime prevention programs fine that must be included in the abstract of judgment are:  a $10 state penalty (§ 1464, subd. (a)(1)); a $7 county penalty (Gov. Code, § 76000, subd. (a)(1)); a $5 state court construction penalty (Gov. Code, § 70372, subd. (a)(1), as amended effective Jan. 1, 2012); a $1 deoxyribonucleic acid penalty (Gov. Code, §76104.6, subd. (a)(1), as amended effective January 1, 2012); a $3 state-only deoxyribonucleic acid penalty (Gov. Code, § 76104.7, subd. (a), as amended effective June 30, 2011, to June 26, 2012); and a $2 emergency medical services penalty (Gov. Code, § 76000.5, subd. (a)(1)).

### IV.  DISPOSITION

The judgment is affirmed.  Upon remittitur issuance, the abstract of judgment must be amended to reflect:  concurrent sentences on counts 1 and 2 rather than Penal Code section 654, subdivision (a) stays; $120 in court operations assessments (Pen. Code,

13

§ 1465.8, subd. (a)(1)); $90 in court facilities assessments (Gov. Code, § 70373, subd. (a)(1)); and penalties and assessments on the $10 local crime prevention programs fine (Pen. Code, § 1202.5, subd. (a)) in addition to the $2 state surcharge (Pen. Code, § 1465.7, subd. (a)).  The additional penalties and assessments on the local crime prevention programs fine that must be included in the abstract of judgment are:  a $10 state penalty (Pen. Code, §1464, subd. (a)(1)); a $7 county penalty (Gov. Code, §76000, subd. (a)(1)); a $5 state court construction penalty (Gov. Code, § 70372, subd. (a)(1), as amended effective Jan. 1, 2012); a $1 deoxyribonucleic acid penalty (Gov. Code, § 76104.6, subd. (a)(1), as amended effective January 1, 2012); a $3 state-only deoxyribonucleic acid penalty (Gov. Code, § 76104.7, subd. (a), as amended effective June 30, 2011, to June 26, 2012); and a $2 emergency medical services penalty (Gov. Code, § 76000.5, subd. (a)(1)).  The clerk of the superior court must deliver a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P.J.


We concur:


KRIEGLER, J.


MINK, J.[*]

---

[*] Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14